Mary Pat PECK, Jeannie O'Halloran, Thomas Lynch, and Grace Glaser Lynch, Plaintiffs,

v.

**UPSHUR COUNTY BOARD OF EDUCATION and Lynn E. Westfall, Defendants.**

Civil Action No. 2:95–CV–21.

United States District Court, N.D. West Virginia.

Sept. 30, 1996.

Allan N. Karlin, Morgantown, WV, Robert M. Bastress, Morgantown, WV, for Plaintiffs.

Michael D. Lorensen, Bowles, Rice, McDavid, Graff & Love, Martinsburg, WV, Dean L. Whitford, David R. Melton, The Rutherford Institute, Charlottesville, VA, for Defendants Upshur County Board of Education and Lynn E. Westfall.

## MEMORANDUM OPINION AND ORDER

KEELEY, District Judge.

### Statement of the Case

This is a civil rights case, brought pursuant to 42 U.S.C. § 1983. The issue at the heart of the case concerns a policy adopted by the defendant Upshur County Board of Education ("the Board" or "Upshur County Board"), which operates the public schools in Upshur County, that permits non-students to disseminate Bibles and other religious materials in the public schools during school hours. The plaintiffs include a teacher and several parents of children who attend Upshur County public schools. Despite the Board's contention that it has created a limited forum which is open to the distribution of religious and secular materials, these plaintiffs claim that no such access has been granted to other individuals and groups also wishing to distribute literature. Consequently, they allege that the Board's policy establishes and supports religion and further discriminates on the basis of the content of the materials whose distribution is sought, all in violation of their rights under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and Article III, §§ 7 and 15 of the West Virginia

Constitution. The plaintiffs seek a permanent injunction prohibiting the defendants from granting access to the public schools to any individual or group desiring to distribute Bibles or other religious materials during school hours.

## I. *FACTUAL BACKGROUND*

In early August, 1994, Lynn E. Westfall, Superintendent of Schools in Upshur County,[1] received requests from several citizens in Upshur County, including two state senators and a high school teacher named Eddie McDaniel, who is also a minister, that the Upshur County Board allow members of the community to make Bibles available in schools so that students who could take one for their personal use if they wanted. According to Westfall, these individuals are part of a group of citizens who want the students in the public schools of the county to have access to Bibles.

In the past, the Upshur County public schools have allowed outside organizations, such as Little League, 4–H, Boy Scouts, and the Women's Christian Temperance Union ("WCTU"), to distribute informational announcements and pamphlets in the schools. Until approximately five years ago, when the Board developed the policy at issue here that prohibited the "distribution" of religious and political materials,[2] the Gideons also were permitted to pass out Bibles in the schools. Outside organizations must secure permission from school authorities before gaining access, and no evidence in the record suggests that securing this permission is a mere formality. Normally, these organizations contact a person in charge of school activities who reviews the materials before they are made available to students.

On December 6, 1994, over 500 citizens who supported the request attended a regularly scheduled meeting of the Board. Many of them carried banners and signs indicating their support of the proposal, as well as their affiliation with various Christian churches in the community. A number of students who were present also spoke on behalf of the proposal. The Board then decided that permitting religious materials, including the Bibles, to be "made available" in Upshur County schools during the school day did not violate the Board's policy prohibiting the "distribution" of religious and political material to students, and instructed Superintendent Westfall to meet with Eddie McDaniel to work out the details of making the Bibles available in the schools.

Thereafter, on December 14, 1994, Superintendent Westfall met with Mr. McDaniel and another Upshur County resident, Don Parsons, and agreed that on Monday, February 27, 1995, a group of citizens would be allowed to make Bibles available during school hours so that students who wanted to might take one for their personal use. According to the procedure agreed to, the School Board would provide a table in each school building on which boxes of Bibles could be placed. Each table was to be located in an area of the school building, such as the library or a corridor, where students normally congregate and would not feel they were being watched or pressured into taking a Bible. Only representatives of the sponsoring citizens' group would place the Bibles

---

1. Superintendent Westfall retired while this action was pending.

2. The policy in its entirety states:
 Since the public schools must remain neutral concerning matters of particular religious and political beliefs, the Upshur County Board of Education hereby affirms that the following types of materials shall not be distributed to students in the Upshur County Schools:
 1. Materials advocating a particular religion, denomination, or the beliefs thereof;
 2. Materials advocating the views of a particular political party or candidate for any elective office.
 At the same time, the Board affirms that, in the unrestricted pursuit of knowledge, in the study of literature, history, the arts, and the great thinkers of all ages, religious and political ideas and works should be explored in the context of learning from an unbiased point of view. Materials relevant to such learning should be contained within school libraries at levels appropriate for students' study and understanding of such materials in an academic context. In the event that schools conduct mock political elections, care must be exercised that if posters or other campaign materials for political parties or particular candidates are posted in the school, all parties and candidates on the ballot receive equal exposure. If mock elections are conducted, the results must not be announced until after the actual election is over.

on the table, but they would not be allowed to remain in the building to monitor whether any students took one.

Superintendent Westfall agreed that a sign stating "Please feel free to take one" would be placed on each table to inform students that the Bibles were free and available to them.[3] No announcement of the location of the table or the fact that Bibles would be available to interested students would be made over a school's public address system.

Following development of this procedure, Superintendent Westfall instructed principals from the affected schools in the county to monitor the tables throughout the day to ensure adherence to these guidelines. Principals were instructed that the Board was supervising access to the schools, and not sponsoring or promoting the dissemination of Bibles.

## II. *PROCEDURAL HISTORY*

On February 23, 1995, the plaintiffs filed their request for a preliminary injunction and the Court held an evidentiary hearing on plaintiffs' motion on Friday, February 24, 1995. On Monday, February 27, 1995, the Court granted a preliminary injunction. Pursuant to the analysis in *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir.1977), it concluded that the defendants would not be irreparably harmed by the injunction, that the issue before the Court required more investigation, and that it was in the public's best interest to grant the motion and further study the case. The Court also set the trial for the Complaint for Permanent Injunction on March 27, 1995, to consider any new evidence and arguments by the parties.

Now, after carefully considering the evidence and arguments of the parties as well as decisions of the United States Supreme Court discussing the Free Speech and Establishment Clauses of the First Amendment that had not been decided at the time of the hearings in this matter, the Court finds that this free expression of private religious speech in a nonpublic forum that has been opened for limited purposes consistent with the teaching mission of the Upshur County

schools does not violate the Establishment Clause. For the reasons set forth below, it VACATES its Order granting a preliminary injunction and DENIES the plaintiffs' motion for a permanent injunction.

## III. *LEGAL ANALYSIS*

### A. *The Standard for Permanent Injunction.*

■■■ A federal district court has wide discretion to grant appropriate injunctive relief in a particular case, *Richmond Tenants Organization, Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir.1992) (citing *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973)), as long as the injunctive relief is designed to fully remedy the injury to the prevailing party without going beyond the extent of the established violation. *Hayes v. North State Law Enforcement Officers Ass'n*, 10 F.3d 207, 217 (4th Cir.1993) (citing *Consolidation Coal Co. v. Disabled Miners*, 442 F.2d 1261, 1267 (4th Cir.), *cert. denied*, 404 U.S. 911, 92 S.Ct. 228, 30 L.Ed.2d 184 (1971)). The Court must determine, however, whether the plaintiffs have actually succeeded on the merits (i.e. met their burden of proof), and if so, the Court must then consider the appropriate remedy. *See Ciba–Geigy Corp. v. Bolar Pharmaceutical Co., Inc.*, 747 F.2d 844, 850 (3d Cir.1984).

### B. *The Degree of First Amendment Protection Afforded to the Expression.*

■■■ The distribution of Bibles and other religious materials by private citizens constitutes protected expression under the First Amendment. The First Amendment, which the Fourteenth Amendment makes applicable to the states, declares that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech...." The distribution of religious literature, in particular, has been recognized by the Supreme Court as a form of protected speech. In *Murdock v. Pennsylvania*, 319 U.S. 105, 110, 63 S.Ct. 870, 873–874, 87 L.Ed. 1292 (1943), the United States Supreme Court held that "spreading one's religious

---

**3.** Upon request, nonreaders could have the sign read to them by a teacher.

beliefs or preaching the Gospel through distribution of religious literature ... is an age-·old type of evangelism with as high a claim to constitutional protection as the more orthodox types." Moreover, private religious speech, including religious proselytizing, is as fully protected under the Free Speech Clause as secular private expression. *See Capitol Square Review and Advisory Board v. Pinette,* —— U.S. ——, ——, 115 S.Ct. 2440, 2446, 132 L.Ed.2d 650 (1995); *Lamb's Chapel v. Center Moriches Union Free School Dist.,* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); *Heffron v. International Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).

■ Although the plaintiffs argue that this case involves government speech on religious subjects, the Board's policy addresses access to the public schools by private individuals or groups wishing to distribute religious literature. "There is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Pinette,* —— U.S. at ——, 115 S.Ct. at 2448 (citing *Board of Ed. of Westside Community Schools (Dist. 66) v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 2371–2372, 110 L.Ed.2d 191 (1990) (O'Connor, J., concurring)) (emphasis in the original). Nonetheless, the closer in proximity government and private speech come, the more difficult it may be to ignore even an erroneous conclusion that the state is endorsing a particular religion or favoring religion over nonreligion.

In *Pinette,* Justice Scalia emphasized that the Establishment Clause traditionally applied only to words and acts of the government, and, consequently, mistaken conclusions about privately sponsored religious expression should be disregarded in a public forum, open to all on an equal basis. *Pinette,* —— U.S. at ——–——, 115 S.Ct. at 2448–2449. In a concurring opinion, however, Justice O'Connor asserted that "an impermissible message of endorsement can be sent in a variety of contexts, not all of which involve direct government speech or outright favoritism." *Id.* at ——, 115

S.Ct. at 2452. By her analysis, the endorsement test offers an appropriate benchmark by which the courts may evaluate the constitutionality of private religious expression on public property. *Id.*

This Court, therefore, must address whether the Upshur County Board has a constitutional obligation under the Free Speech and Establishment Clauses to restrict the distribution of religious materials in the public schools during the school day. Before the Court can analyze whether the Board's policy, in fact, violates the Establishment Clause, however, it must first consider the extent to which a forum has been made accessible to other private speakers.

## C. *The Nature of the Forum.*

"The right to use government property for one's private expression depends upon whether the property has by law or tradition been given the status of a public forum, or rather has been reserved for specific official uses." *Pinette,* —— U.S. at ——, 115 S.Ct. at 2446 (citing *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 802–803, 105 S.Ct. 3439, 3448–3450, 87 L.Ed.2d 567 (1985)).

### 1. *PUBLIC FORUM ANALYSIS*

Traditional public fora consist of places, such as streets and parks, that "by long tradition or by government fiat have been devoted to assembly and debate." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449 (quoting *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954–955, 74 L.Ed.2d 794 (1983)). Designated or limited public fora, traditionally not open to the general public, may be created by the government for public use for expressive activity by certain groups, or for the discussion of certain subjects. *Perry,* 460 U.S. at 45–46, 103 S.Ct. at 954–956.

■ In both traditional and designated public fora, reasonable content-neutral time, place, and manner regulations are permissible, but expressive content may be restricted only if the distinction is narrowly drawn and necessary to effectuate a compelling state interest. *Pinette* —— U.S. at ——, 115 S.Ct.

at 2446 (citing *Perry*, 460 U.S. at 45, 103 S.Ct. at 954–955).[4] On the other hand, there can be no doubt that states and local school boards are afforded considerable discretion in operating public schools. *Edwards v. Aguillard*, 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987).

■ After considering the history of the forum, the practice and policy of the Board, and the nature of the property, this Court finds that the Upshur County Board did not create a public forum. First, the Board's history of allowing outside groups or individuals to distribute material in the public schools during school hours does not indicate that a public forum has been opened. In *Perry*, a case involving access to a school district's internal mail system, the Supreme Court concluded that "the schools do allow some outside organizations such as the YMCA, Cub Scouts, and other civic and church organizations to use the facilities[, but] [t]his type of selective access does not transform government property into a public forum." *Perry*, 460 U.S. at 47, 103 S.Ct. at 956.

Like the school district in *Perry*, the Upshur County public schools have allowed outside organizations, such as Little League, 4–H, Boy Scouts, and the WCTU, to distribute informational announcements and pamphlets in the schools.[5] This type of "selective access," however, does not create a public forum. *Id.* In fact, the Board's practice and policy belie any claim that the Board intended to designate the county schools as a public forum for use by the general public.

Outside organizations must secure permission from school authorities before gaining access, and, as noted earlier, no evidence in the record suggests that securing this permission is a mere formality. *Id.* Normally, these organizations contact a person in charge of school activities who reviews the materials before they are made available to students. Testimony by both Martha Feola, a member of the Board, and Superintendent Westfall established that a certain level of review to determine age appropriateness and legality would take place to determine if outside materials could enter the school system.

■ Finally, the nature of public school property as a place to educate children, as opposed to a place opened to the general public for expressive activity, strengthens the conclusion that the Board did not create a public forum. Nonpublic fora consist of government properties that are not by tradition or designation fora for public communication and which the government may preserve for intended uses. *Perry*, 460 U.S. at 46, 103 S.Ct. at 955. "[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *Id.* (citing *United States Postal Service v. Council of Greenburgh Civic Assns.*, 453 U.S. 114, 130 n. 6, 101 S.Ct. 2676, 2685 n. 6, 69 L.Ed.2d 517 (1981)).

■ *Lamb's Chapel* involved a school district's decision to open school facilities for private functions. There the Supreme Court confirmed that "there is no question that the

---

4. The Supreme Court's analysis of public, designated or limited, and nonpublic fora in various opinions can create confusion as to where to draw a distinction between the forum types. *In Cornelius*, 473 U.S. at 813–833, 105 S.Ct. at 3454–3465 (Blackmun, J., dissenting), Justice Blackmun asserted that the majority's analysis essentially "collapses the three categories of public forum, limited public forum, and nonpublic forum into two," and "makes it *virtually* impossible to prove that a forum restricted to a particular class of speakers is a limited public forum." *Id.* at 825, 105 S.Ct. at 3461 (emphasis in original). He argued that the majority had removed any distinction between the standard of public and limited public fora. In *Lamb's Chapel*, 508 U.S. at 392–393, 113 S.Ct. at 2147, the Court held limited and nonpublic fora to the same

standard. Thus, the tendency to categorize the forum as "public" or "nonpublic" and then to move "limited public forum" between the two categories is understandable in light of the Supreme Court's mixed message.

5. At trial, the plaintiffs distinguished the distribution of informational pamphlets from the distribution of literature (i.e. Bibles). Had the Board *precluded* the citizens' group from making Bibles available, this distinction may have been significant to the Court's analysis. Inasmuch as the Board granted permission to the group to make Bibles available in the public schools, the only issue before the Court is whether such access is consistent with the educational mission of the Upshur County public schools and, if so, whether it violates the Establishment Clause.

District, like the private owner of property, may legally preserve the property under its control for the use to which it is dedicated." 508 U.S. at 390, 113 S.Ct. at 2146 (emphasis added). Furthermore, without an intent to open the forum up to the public at large, the government does not create a public forum by simply permitting limited discourse on the property. *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3448–3449 (citing *Perry* 460 U.S. at 46, 103 S.Ct. at 955–956).

## 2. *NON PUBLIC FORUM ANALYSIS*

The parties disagree as to what type of forum the Upshur County Board actually had in place or created. The plaintiffs assert that the schools are nonpublic while the defendants argue that the Board created a limited public forum. In light of the public schools' continued control over access to the forum and the educational mission of teaching children, it is the Court's opinion that the Board, through policy and practice, created a nonpublic or "limited purpose" forum to which selective access is permitted for the purpose of enhancing the educational mission of the public schools.

■ "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Lamb's Chapel,* 508 U.S. at 392–393, 113 S.Ct. at 2147 (quoting *Cornelius,* 473 U.S. at 804–806, 105 S.Ct. at 3450–3451); *Rosenberger v. Rector & Visitors of Univ. of Va.,* — U.S. —, —, 115 S.Ct. 2510, 2517, 132 L.Ed.2d 700 (1995); *Perry,* 460 U.S. at 49, 103 S.Ct. at 957; *Grossbaum v. Indianapolis–Marion Bldg. Authority,* 63 F.3d 581, 591 (7th Cir.1995). The categorical exclusion of religious speech, however, is impermissible discrimination when such speech is consistent with the purpose of the forum and is similarly situated to permitted speech. *Lambs Chapel,* 508 U.S. at 393–394, 113 S.Ct. at 2147–2148; *Good News/Good Sports Club v. School Dist.,* 28 F.3d 1501 (8th Cir.1994).

Superintendent Westfall and Board member Feola testified that the Board and individual schools historically have allowed private speakers to access the public schools. The Board's express purpose in allowing materials to be made available to students has been to enhance their education by exposing them to a broad spectrum of knowledge. By having allowed information from the Scouts, Little League, 4–H, the WCTU, and, formerly, the Gideons, to be made available to students, the Board implicitly found that this information enhanced their education.

Here, the Board has concluded that making Bibles available to students who wish to have them is consistent with the purpose of the forum. Solely upon the belief that allowing Bibles to be distributed was a violation of the Establishment Clause, the Board previously had adopted the policy prohibiting the distribution of religious materials.[6] Only after the citizens' group involved in this case asserted that no law restricted the availability of Bibles in schools did the Board reconsider its policy. By doing so, and allowing a group of citizens to make Bibles available to any student wanting one, the Board recognized that although the public schools were precluded from distributing such material the Constitution does not prohibit private groups or individuals from doing the same. Moreover, by permitting the distribution of Bibles and other religious material similar in character to material already permitted, the Board was not exhibiting any favoritism.

■ Essentially, the plaintiffs demand that the Court enforce an impermissible viewpoint discrimination against religious material that the Board has concluded is consistent with the purpose of the forum. This the Court cannot do. In *Lamb's Chapel,* a school district that had established a nonpublic forum for "social, civic, and recreational purposes" could not exclude a film presenting a religious perspective on childbearing. 508 U.S. at 393, 113 S.Ct. at 2147. And in *Good News/Good Sports Club,* a religious club sufficiently demonstrated that its

---

**6.** Modern establishment clause jurisprudence has evolved from a focus on Thomas Jefferson's "wall of separation" between church and state to, more recently, decisions that diminish the importance of such a distinct separation. During the time Jefferson's idea dominated, it was not unusual for state agencies to adopt policies similar to the one adopted in Upshur County.

organization contributed to the "moral and character development of the students." 28 F.3d at 1506. In each case the speech was consistent with the purpose of the forum and exclusion because of religious viewpoint was ruled impermissible.

## D. ESTABLISHMENT CLAUSE ANALYSIS

The Court next must determine whether allowing a dissemination of Bibles during school hours when students are required by state law to attend school violates the Establishment Clause. *See Lamb's Chapel,* 508 U.S. at 394, 113 S.Ct. at 2147–2148 (citing *Widmar v. Vincent,* 454 U.S. 263, 271, 102 S.Ct. 269, 275, 70 L.Ed.2d 440 (1981)) (stating that the interest of a State in avoiding an Establishment Clause violation may be compelling enough to justify a restriction of free speech otherwise protected by the First Amendment.)

The First Amendment to the United States Constitution states, in relevant part:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . .

U.S. Const.Amend. I.

Despite an extensive line of United States Supreme Court decisions interpreting this so-called "Establishment Clause", no one following the evolution of the law in this area would suggest that these cases achieve agreement or unanimously predict the result that should obtain here. In *Walz v. Tax Commission,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), the Supreme Court noted that in prohibiting government "establishment" of religion the framers of our Constitution sought specifically to prevent "sponsorship, financial support, and active involvement of the sovereign in religion." *Id.* at 668, 90 S.Ct. at 1411.

Later, in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), after an extensive review of prior establishment clause decisions, the Court isolated three factors indicative of a statute's compliance with the Establishment Clause.

First, the statutes must have a secular purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, [citation omitted]; finally, the statute must not foster an excessive government entanglement with religion. [citation omitted]

*Id.* at 612, 91 S.Ct. at 2111. The *Lemon* test, although discredited in recent years, nonetheless carries forward the proposition that government must refrain from activities tending to "advance" any and all organized religion.[7]

7. The tortured existence of the *Lemon* test, as well as the apparent inability of the Supreme Court to definitively overrule it, were recently documented by Justice Scalia in his concurring opinion in *Lamb's Chapel.*

Like some ghoul in a late-night horror movie that repeatedly rises up in its grave and shuffles abroad, after being repeatedly killed and buried, *Lemon* stalks our Establishment Clause jurisprudence once again, frightening the little children and school attorneys of Center Moriches Union Free School District.

508 U.S. at 398, 113 S.Ct. at 2149–2150.

After discussing the great disparity with which the *Lemon* test has been applied to various factual scenarios over the years, Justice Scalia pointed out that the test has been disregarded by five of the Justices then sitting on the Supreme Court in their own concurring and dissenting opinions. *Id.* Given the Supreme Court's lack of adherence to its own precedent, this Court declines to base its decision here on *Lemon* and its progeny. Within the confines of this footnote, however, it is worth noting that, were the Court to apply the *Lemon* test to the facts of this case, as the plaintiffs urge it to, the dissemination of Bibles in the Upshur County schools under the Board policy at issue still would not violate the Establishment Clause.

Pursuant to the first prong of the test, the Board has proffered a perfectly legitimate secular purpose motivating the modification of its prior policy, specifically, that it sought to end its previous exclusion of religious viewpoints from the limited forum it had established within the schools. This move toward inclusion is consistent with the recent holdings of the Supreme Court in both *Lamb's Chapel* and *Rosenberger,* which, this Court believes effectively rendered the Board's prior policy unconstitutional.

While one must readily concede that no secular purpose underpins the actions of the private citizens involved here, the proper focus is on the actions of the Board. The plaintiffs have presented no evidence tending to prove that the Board had a non-secular purpose in amending its prior policy. In point of fact, they argue that the Board's decision was politically, not religiously, motivated.

That plaintiffs disagree with their popularly elected representatives on the Board is obvious,

This concept was further crystallized by the Court in *Allegheny County v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), in which the Court collapsed the first and second prongs of the *Lemon* test into a single inquiry:

> [W]hether the challenged governmental practice either has the purpose or effect of "endorsing" religion.

*Id.* at 592, 109 S.Ct. at 3100. In elaborating on the exact definition of government "endorsement" of religion, the Court further stated:

> Whether the key word is "endorsement," "favoritism," or "promotion," the essential principle remains the same. The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from "making adherence to a religion relevant to a person's standing in the political community." *Lynch v. Donnelly*, 465 U.S. [668] at 687 [104 S.Ct. 1355] at 1367 [79 L.Ed.2d 604] (1984) (O'Connor, J., concurring in the judgment).

*Allegheny County*, 492 U.S. at 593–594, 109 S.Ct. at 3101. Accordingly, it is clearly established that government policies that facially discriminate in favor of or against religion violate the Establishment Clause.

As the Court has noted, however, the exact point at which a government policy that is facially neutral toward religion but which also might confer an incidental benefit on religion, such as the policy under review here, becomes impermissible government "endorsement" of religion has never been precisely charted, and continues to be a hotly debated question within the Supreme Court.

The Court addressed this issue most recently in *Pinette*. There, the Ku Klux Klan, through a standard application process, had attempted to obtain a permit allowing the placement of an unattended cross in a public plaza directly adjacent to the Ohio Statehouse known as "Capitol Square." The Capitol Square Review and Advisory Board, which ultimately passed on such applications, had a general policy of allowing displays reflecting a "broad range" of speech to be placed within the plaza, including a United Way "thermometer," privately sponsored menorah displays, and a state sponsored Christmas tree. —— U.S. at ——, 115 S.Ct. at 2444. The Board denied the Klan's application, however, on the ground that the placing of a cross in such close proximity to the very seat of state government would effectively constitute government "endorsement" of religion, and thereby violate the Establishment Clause.

---

but to insinuate, as they attempt to, that there is something sinister about an elected body responding to the wishes and convictions of a sizable group of its constituents misses the point. This sort of responsiveness is entirely proper under our system of government, and the fact that a group of like-minded, religiously motivated private citizens banded together to petition their elected representatives does not, nor should it in any way, impact this Court's determination regarding the Board's purpose in construing its policy. Indeed, all would certainly agree it is the prerogative (some would say a duty) of elected policy makers to consider the wishes of the constituents from whence their franchise springs. To hold otherwise would contravene the basic axioms of representative government.

The second prong of the *Lemon* test seeks to determine whether the policy in question has the primary effect of advancing or inhibiting religion. The Board's policy does not produce such an effect since, as modified, it is specifically neutral toward religion. It simply allows information reflecting religious viewpoints to be made available to students within the pre-existing limited forum. Such a policy, in the Court's view,

neither advances nor inhibits religious viewpoints within the forum, but simply affords them parity with the other viewpoints represented there. Accordingly, the second prong is also satisfied.

Nor does the Board's policy violate the third prong of *Lemon* by fostering excessive government entanglement with religion. The means by which the Bibles and other religious materials are to be procured and placed within the schools will be directed by private citizens as opposed to school personnel. Moreover, the Bibles will be made available to students on a strictly voluntary basis. School personnel will not perform any custodial tasks related to the tables on which the Bibles are placed. Consequently, the new policy offers virtually no risk of the intermingling of government influence in the administration of church affairs, or vice versa, factors generally necessary to find a violation of the third prong. *See Lemon, supra* 403 U.S. at 615, 91 S.Ct. at 2112.

The Board's actions do not violate the Establishment Clause under the so-called *Lemon* test.

The Klan filed suit in the United States District Court for the Southern District of Ohio seeking to enjoin denial of its application. After finding that the Board had failed to show that the allowance of such a display could reasonably be construed as state endorsement of Christianity, the Court granted the injunction. On appeal, the Sixth Circuit Court of Appeals affirmed the district court's ruling. The Supreme Court then granted certiorari to resolve the question whether a state government violates the Establishment Clause when, pursuant to a religiously neutral policy, it allows a private group, such as the Klan, to display a religious symbol in close proximity to the traditional seat of government. —— U.S. at ——, 115 S.Ct. at 2444.

The Court affirmed the district court's ruling by a 7–2 majority. This majority, however, was comprised of two factions, each of which applied a different analysis to arrive at the ultimate conclusion that allowing the Klan to place its cross in Capitol Square does not constitute impermissible government "endorsement" of religion. Because there can be a significant variance between these two approaches, the Court will apply them both to the facts at hand.

### 1. *"NEUTRALITY TEST".*

 Writing for the plurality, which also included Justices Kennedy, Thomas, and Chief Justice Rehnquist, Justice Scalia applied what has come to be characterized as the "neutrality test."[8] This test places great emphasis on the governmental intent underlying the policy in question. He categorically rejected the notion that a governmental body can violate the Establishment Clause merely by allowing private religious speech to occur in close proximity to symbols of government. —— U.S. at ——, 115 S.Ct. at 2448. In his view, that such speech might reasonably be mistaken for government speech is not sufficient to constitute impermissible government "endorsement" of religion, at least in the absence of government action tending to encourage or foster the mistake. *Id.*

Justice Scalia's "neutrality" approach envisions only two scenarios in which a government policy relating to private religious expression would run afoul of the Establishment Clause. The first is when the expression actually emanates from the government itself, and the second is when the government has overtly discriminated in favor of the otherwise private religious expression.[9] —— U.S. at ——, 115 S.Ct. at 2447.

Unquestionably, the Upshur County Board's policy of allowing a group of private citizens to make Bibles available to students would not violate the Establishment Clause under the "neutrality" test. It cannot plausibly be argued that the Board's amended policy constitutes religious expression emanating from the government because the actual acquisition and placement of the Bibles will be carried out by private citizens. The central fact in this case is that the Bible project is privately sponsored and not a custodial project of the schools. At most, the Board is allowing religious speech, emanating from private individuals, to take place within its schools. This is a far cry from religious speech that emanates from the Upshur County Board itself.

Nor can it be said that the Board is discriminating in favor of a particular religious belief or sect. Indeed, the record of this

---

8. *See* Recent Case, *Establishment Clause—Religious Displays on Public Property—Colorado Supreme Court Upholds Display of Ten Commandments on Public Property,* 109 Harvard Law Review 530, 534 (1995).

9. The latter scenario is best illustrated in *Allegheny County*. There, the Court held that the display of a creche, or nativity scene, in a county building did constitute an impermissible "endorsement" of religion and therefore violated the Establishment Clause even though the County also permitted displays representing other religious viewpoints within the building.

Central to the Court's reasoning was the fact that the county government had allotted space for the creche display, to the exclusion of other displays, on the "Grand Staircase" of the building, which the Court described as the "main and 'most beautiful part' of the building that is the seat of county government." *Id.* 492 U.S. at 599, 109 S.Ct. at 3104. Commenting on the apparently preferential placement of the creche display, the Court stated:

No viewer could reasonably think that it occupies this location without the support and approval of the government.

*Id.* at 599–600, 109 S.Ct. at 3104.

case is replete with the acknowledgment from school officials that, in reinterpreting its prior policy, the Board was effectively allowing the placement of "religious materials" generally in its schools, not just those reflecting the Christian viewpoint. While the effect of the Board's policy might incidentally benefit the Christian religion, given the heavily Christian makeup of Upshur County's population, this is clearly not enough to violate the Establishment Clause under the "neutrality" approach, which requires overtly discriminatory government action.

Accordingly, the Court concludes that the placement of Bibles within the Upshur County public schools pursuant to the School Board's policy regarding the availability of religious materials does not violate the Establishment Clause of the First Amendment under the "neutrality test."

## 2. "ENDORSEMENT TEST".

 In a concurrence joined by Justices Souter and Breyer,[10] Justice O'Connor articulated a different test to determine when facially neutral government action constitutes an impermissible "endorsement" of religious speech in violation of the Establishment Clause. Referring to her analysis as the "endorsement test", she reasoned that:

A government statement "that religion or a particular religious belief is favored or preferred," [citations omitted], violates the prohibition against establishment of religion because such "[e]ndorsement sends a message to non-adherents" that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, fa-

vored members of the community. [citations omitted].

*Pinette,* —— U.S. at ——, 115 S.Ct. at 2452.

While this premise is not necessarily anathema to the "neutrality test," Justices O'Connor and Scalia clearly part company on the significance of governmental intent. In Justice O'Connor's view, government can, through its actions, make religion relevant to standing in the political community without intending to do so, and, in those situations where government actions have the "effect" of endorsing religious speech, the Establishment Clause places an affirmative obligation upon government to actively avoid the perception that it is "endorsing" a private religious message. —— U.S. at ——, 115 S.Ct. at 2454.

Key in the analysis of whether a particular government action has the "effect" of endorsing private religious speech is her evaluation of such actions from the perspective of a "reasonable observer." *Id.* Modeled on the "reasonable prudent person" who forms the keystone of the law of torts, the "reasonable observer" represents

a personification of a community ideal of reasonable behavior, determined by the [collective] social judgment. [citations omitted]

—— U.S. at —— —— ——, 115 S.Ct. at 2455–2456. In contrast to the observer offered by Justice Stevens in his dissent, Justice O'Connor endows her "reasonable observer" with a higher degree of knowledge than a "casual passerby." *Id.*[11]

Accordingly, the "reasonable observer" is deemed to be aware of "the history and context of the community and forum in which the religious [speech] appears." *Id.* The

---

**10.** Justice Souter also filed a concurring opinion in which Justices O'Connor and Breyer joined. This concurrence utilizes the same analytical framework as Justice O'Connor's with respect to "endorsement", but analyzes past Establishment Clause decisions in greater detail. *See Pinette,* —— U.S. at ——, 115 S.Ct. at 2457 (Souter, J., concurring in the judgment).

**11.** While embracing the general concept of the endorsement test, Justice Stevens, in his dissenting opinion, took issue with the amount of knowledge to be imputed to Justice O'Connor's "reasonable observer" which he referred to as

an "ultra-reasonable observer" who understands the vagaries of this Court's First Amendment jurisprudence.
*Pinette,* —— U.S. at —— —— ——, 115 S.Ct. at 2469 (Stevens J., dissenting). Beginning from the position that a private religious display violates the Establishment Clause when *some* reasonable observers would perceive state endorsement of religion, Justice Stevens would have evaluated the Klan's display from the vantage point of a casual passer-by "who [is] unaware of Capitol Square's history." *Id.* at —— n. 14, 115 S.Ct. at 2470 n. 14.

"reasonable observer" of the Klan's cross is, therefore, imputed

knowledge that the cross is a religious symbol, that [Capitol Square] is owned by the State, and that the large building nearby is the seat of state government ... [citations omitted] ... [as well as knowledge of] the general history of the place in which the cross is displayed.

*Id.* at ——————, 115 S.Ct. at 2455–2466. .

Ultimately, Justice O'Connor concludes that the imputed knowledge of Capitol Square's history, in tandem with the possibility that a written disclaimer of government sponsorship might be placed on the cross by the Klan, would sufficiently negate any perception of a reasonable observer that the State is "endorsing" Christianity by allowing the Klan to erect its cross. *Id.*

To properly apply the "endorsement test" paradigm to the facts of this case, one must examine the likely effects of the Board's policy through the eyes of a "reasonable student," molded largely in the image of Justice O'Connor's "reasonable observer." This student, therefore, must be deemed aware of the Bible's religious significance as well as of the school system's intimate connection with state and county government. More importantly, however, this student must also be deemed to be aware of the general history of the school's common areas where the Bibles are to be placed, and, specifically, the uses to which these particular areas have been devoted in the past. This must necessarily include knowledge that these areas have previously been used by the Little League, 4–H, Boy Scouts, and other private groups to distribute their literature.

Such an imputation is quite significant since the Supreme Court has held that the availability of school grounds to a variety of organizations tends to negate the danger that a reasonable student would perceive "endorsement" of religion in any single instance. *See Widmar v. Vincent,* 454 U.S. 263, 271–276, 102 S.Ct. 269, 275–278, 70 L.Ed.2d 440

(1981); *see also Lamb's Chapel,* 508 U.S. at 395, 113 S.Ct. at 2148.

Furthermore, knowledge of the general history of the school's common areas would make a "reasonable student" cognizant of the fact that, except for occasional monitoring of the tables, school personnel are not actively involved in the distribution of such material, at least in their official capacities. This conclusion flows logically from the inevitable observation that the materials are unattended and that, unlike other materials found in schools such as textbooks and report cards, their acquisition is totally voluntary.

Any concern that the "reasonable student" might mistake the availability of Bibles for impermissible "endorsement" of Christianity would be further alleviated by the placing of signs on the tables holding the Bibles. Superintendent Westfall testified that such signs would accompany the Bibles and state that students should "feel free to take one." The placement of such signs undoubtedly would reinforce for the "reasonable student" the notion that perusal and acquisition of the Bibles is strictly voluntary, and indicate that school officials are not supervising whether any particular student chooses to take one.

Moreover, through the inclusion of an express disclaimer of school sponsorship of the program on these signs, the Board could further ensure that the "reasonable student" would not perceive impermissible government endorsement of Christianity. Although there is no evidence in the record about whether the Board intends to include such a disclaimer, neither is there any suggestion that it would be averse to doing so. Furthermore, there is evidence that the Board recognized its responsibility to communicate to students the voluntary, noncompulsory nature of the Bible dissemination. Indeed, the mere "possibility" that such a disclaimer could be affixed to the Klan's cross in *Pinette* persuaded both Justices O'Connor and Souter that the display did not violate the Establishment Clause. *Pinette,* —— U.S. at —— and ——, 115 S.Ct. at 2453 and 2457.[12]

---

12. The record in *Pinette* included a letter from Klan representatives conceding the right of the State of Ohio to require them to affix an express disclaimer to the cross, and further stating that

the Klan would affix such a disclaimer, the contents of which would be "open to negotiation." *Pinette,* —— U.S. at ————, n. 1, 115 S.Ct. at 2461–2461, n. 1.

Moreover, even if the Board were to use the sign that is currently contemplated, it is the Court's opinion that it will sufficiently dispel any student misperceptions that the availability of Bibles within their schools constitutes an institutional endorsement of Christianity.

The plaintiffs are correct that there are significant differences between the traditional public forum at the center of *Pinette* and the limited forum created by the Board in this case. Unlike the traditional public forum provided by Capitol Square, the Upshur County schools provide a "captive" audience to those speakers fortunate enough to be granted access. Additionally, unlike the Klan in *Pinette,* the private citizens who seek access to the limited forum existing within the schools are not members of the student community for whose benefit the forum was established.

Although both these factors distinguish this case from *Pinette,* in this Court's opinion neither alters the factual mix to the extent that a different result is required here. The fact that school age children, presumably of all faiths, are compelled to be in close proximity to the forum is counterbalanced by the voluntary basis on which the religious materials will be made available. No student will be forced to take a Bible, and the mere fact that students might inadvertently come into contact with an unattended table full of free Bibles does not, in this Court's opinion, present a significant risk of perceived "endorsement" of Christianity in light of the general context in which the "reasonable student" will perceive the tables.

The plaintiffs fear that not all students in Upshur County are mature enough to distinguish the acts of a group of private citizens from those of the Board. They particularly point to the fact that the Board's policy, on its face, does not recognize the different ages of students in the elementary, middle and high schools to whom the Bibles will be made available.

There is little doubt that the schools will have to address the issue of age appropriateness in implementing the Board's policy. At the permanent injunction hearing, the Board's witnesses recognized a responsibility to screen materials disseminated for age appropriateness and to make clear to students that they were not being compelled to take a Bible. In this Court's view, therefore, the Board's policy adequately addresses the issue of age disparity among students to whom Bibles may be made available.

Accordingly, the policy of the Upshur County Board does not evince government "endorsement" of religion under Justice O'Connor's "endorsement test". *See Mergens,* 496 U.S. at 251, 110 S.Ct. at 2372–2373 (1990).

### E. *CONCLUSION*

The Court finds that the Upshur County Board of Education's policy permitting private citizens to enter its schools to make Bibles available to students is consistent with the purpose of the limited forum created by the Board, and does not constitute impermissible government endorsement of religion under either the "neutrality test" or "endorsement test," which, in tandem, have been adopted by a clear majority of the current United States Supreme Court. Consequently, the Board's policy does not offend the Establishment Clause of the First Amendment to the United States Constitution, and the Court therefore VACATES the preliminary injunction it granted on February 27, 1995 and DENIES the plaintiffs' request for a permanent injunction.

It is so ORDERED.