155 F.3d 274
 129 Ed. Law Rep. 77
 Mary Pat PECK; Jeannie O'Halloran; Thomas Lynch,
Plaintiffs-Appellants,
Grace Glaser Lynch; James Lockhart, Plaintiffs,
v.
UPSHUR COUNTY BOARD OF EDUCATION; Richard G. Hoover, in his
official capacity as superintendent of Upshur
County Schools, Defendants-Appellees.
Americans United for Separation of Church and State; the
American Jewish Congress; Texas Justice
Foundation, Amici Curiae.
 No. 96-2544.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 2, 1997.
Decided Aug. 14, 1998.
 
 ARGUED: Robert Milton Bastress, Jr., Morgantown, West Virginia, for Appellants. James Jeffrey Knicely, Knicely & Cotorceanu, P.C., Williamsburg, Virginia, for Appellees. ON BRIEF: Allan N. Karlin, Allan N. Karlin & Associates, Morgantown, West Virginia, for Appellants. Professor Gary C. Leedes, T.C. Williams School of Law, University of Richmond, Richmond, Virginia; Michael D. Lorensen, Bowles, Rice, McDavid, Graff & Love, Martinsburg, West Virginia, for Appellees. Steven K. Green, Julie A. Segal, Americans United For Separation of Church and State, Washington, DC, for Amicus Curiae Americans United. Marc D. Stern, American Jewish Congress, New York City, for Amicus Curiae Congress. Eric Bohnet, Midland, Texas; Gregory S. Coleman, Shelton M. Vaughan, Robert W. Higgason, Weil, Gotshal & Manges, L.L.P., Houston, Texas, for Amicus Curiae Foundation.
 Before LUTTIG and MOTZ, Circuit Judges, and MICHAEL, Senior United States District Judge for the Western District of Virginia, sitting by designation.
 Affirmed in part and reversed in part by published opinion. Judge LUTTIG wrote the opinion, in which Senior Judge MICHAEL joined. Judge DIANA GRIBBON MOTZ wrote an opinion concurring in part and dissenting in part.
 OPINION
 LUTTIG, Circuit Judge:
 
 
 1
 The Upshur County West Virginia School Board has, for some years now, allowed non-student, private groups such as Little League, Boy Scouts, Girl Scouts, 4-H, and the Women's Christian Temperance Union to distribute literature in the Upshur County public schools. In accordance with written policy, however, the Board has denied groups wishing to distribute religious or political materials the same access to the County's schools. Three years ago, in response to a request by a local religious group, and in an attempt to blunt the Board's discrimination against private religious and political speech, the Board interpreted its written policy so as to allow the passive distribution of religious (and political) material in the schools. Pursuant to this new policy, the Board thereafter designated a single day during the year on which private religious groups can make Bibles or other religious material available on tables set up in accessible locations, such as halls or libraries, in the Upshur County schools. The table displays are set up and stocked entirely by private citizens who are not affiliated in any way with the schools, and the tables bear signs informing students only that they should feel free to take the Bibles or other material offered. Pursuant to district court injunction, the tables also bear a disclaimer, renouncing any sponsorship or endorsement by the school. No one is allowed to enter classrooms to announce the availability of the religious or political material, or to stand at the tables to encourage or pressure students to take the material. No school announcement or assembly is allowed to mark the availability of the Bibles or any other religious or political material. School principals are charged with ensuring strict compliance with these guidelines.
 
 
 2
 Upon challenge by appellants, the district court held that the School Board could, for one day during the year, permit the table displays without violating the Establishment Clause because the Board has a neutral policy of allowing religious and nonreligious groups alike to set up such displays in the schools, and because the displays do not constitute an impermissible endorsement of religion. Except as to one aspect of the district court's judgment discussed below, we affirm.
 
 I.
 A.
 
 3
 The Upshur County School Board has historically allowed nonstudent, private groups, such as Little League, Boy Scouts, Girl Scouts, 4-H, and the Women's Christian Temperance Union, to distribute literature in the schools, although there has been no formal, written policy to this effect. Superintendent Lynn E. Westfall or school activity personnel "review materials before they are made available to be distributed to students," J.A. at 96, 104, 136, to ensure that the materials are age "appropriate" and not "harmful to children" and that the materials will not cause a "[m]ajor disruption" of the school environment. J.A. at 117-18, 123, 136, 160-61, 163-64, 195. In response to an incident in which members of the Gideons "went into the classroom, talked to the students, and then handed Bibles to the students," J.A. at 122-23, 102, however, the School Board adopted a policy in 1989 prohibiting the "distribution" of religious or political advocacy materials to students in the County's schools. The 1989 Policy states in relevant part:
 
 
 4
 Since the public schools must remain neutral concerning matters of particular religious and political beliefs, the Upshur County Board of Education hereby affirms that the following types of materials shall not be distributed to students in the Upshur County Schools:
 
 
 5
 1. Materials advocating a particular religion, denomination, or the beliefs thereof;
 
 
 6
 2. Materials advocating for views of a particular political party or candidate for any elective office.
 
 
 7
 J.A. at 330.
 
 
 8
 During the summer of 1994, two state senators, a local businessman, and Ed McDaniels, a local teacher and minister, approached Superintendent Westfall to ask whether the Board could legally allow religious groups to set up "a table in a predetermined location [in an Upshur County school] with religious material upon it [accessible] to students, where students [could] freely come by and pick up" the materials. J.A. at 182. McDaniels and his supporters believed that then-recent Supreme Court decisions, including Lamb's Chapel v. Center Moriches Union Free School District, 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); Board of Education of Westside Community Schools v. Mergens, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990); and Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), confirmed that, pursuant to a neutral practice of allowing the distribution of literature in the schools, the Board could allow McDaniels' group to make Bibles and other religious material available to students without violating the Establishment Clause and that, in fact, to deny the group the opportunity to do so would affirmatively discriminate against religious speech.
 
 
 9
 In response to the group's request, Westfall sought legal counsel and was advised that there might be Establishment Clause concerns if the Board were to allow personal distribution of Bibles and other religious materials, but that "[t]here was neither statutory nor case law specifically prohibiting" the Board from allowing religious groups to passively make Bibles or other religious material available in the manner proposed. J.A. at 102-03, 224, 243, 302. Westfall informed the other members of the Upshur County School Board of this advice, J.A. at 302, and also of the fact that some of McDaniels' supporters were considering pursuing in court their claim that the Board's policy of forbidding private religious speech impermissibly discriminated against such speech. J.A. at 296.
 
 
 10
 At its December 6, 1994, meeting, the School Board considered McDaniels' request that religious groups be allowed to make Bibles available to Upshur County students one day during the year at predetermined locations in the schools, framing its inquiry as whether McDaniels' request could be accommodated under the language of the existing 1989 Policy. J.A. at 240, 243, 251-52, 268-69. After hearing testimony in support of McDaniels' request, the Board interpreted "distribute" in its 1989 Policy to mean "to hand to, to pass out," J.A. at 21, and distinguished such distribution from passively making materials available for students to pick up if they wished. Thus, the Board determined that the 1989 Policy did not prohibit private groups from making Bibles and other religious material available to students on tables located in the schools. Accordingly, the Board "instructed the Superintendent to meet with Mr. McDaniels to arrange a day for making Bibles available to students of Upshur County schools." J.A. at 330.
 
 
 11
 Superintendent Westfall met with McDaniels on February 14, 1995, to select the day on which McDaniels would be allowed to make Bibles available and to establish the guidelines that McDaniels and his group were to follow. Because the Board was sensitive to possible Establishment Clause concerns, Westfall imposed a number of restrictions on the manner in which the Bibles could be made available. The private groups making the Bibles available were to be responsible for setting up the tables on which the Bibles would be displayed. J.A. at 24. Bibles not picked up by students during the day were to be removed at the end of that day by the groups responsible for the display. J.A. at 24. No teacher or other school employee was to participate in these or any other custodial activity relating to the Bible displays. J.A. at 108. The tables were to be placed in a location in each school (such as a library or hall) that was accessible to students, J.A. at 108, 374, "where students normally congregate and would not feel they were being watched or pressured into taking a Bible," J.A. at 374 (district court op.); there was to be a sign on each table that read "Please feel free to take one," J.A. at 24, 94; and the source of the Bibles was not to be identified, J.A. at 95. No one was to be allowed to stand at the table to encourage or pressure students to take Bibles, J.A. at 25, and no one was to be allowed to enter classrooms to discuss the Bibles' availability, J.A. at 108-09. Moreover, the schools were not to announce that Bibles were available or hold any school assembly in connection with the availability of the Bibles. J.A. at 108. Westfall also "reiterated in that meeting that everyone understood that any other religious material representing any other religious beliefs would be given equal opportunity either on that day or some other day to be arranged ... in the same manner [that the Bibles were] to be made available to students." J.A. at 25.
 
 
 12
 Additionally, Westfall advised Upshur County school principals that the Board was supervising access to the schools, not sponsoring or promoting the dissemination of Bibles, and instructed the principals to ensure compliance with the guidelines. J.A. at 25-26, 375 (district court op.). Westfall also told principals that if a kindergartner was unable to read the sign, the principal could read it to him or help the student to read the sign as a reading exercise. J.A. at 25.
 
 B.
 
 13
 On February 23, 1995, appellants filed suit under 42 U.S.C. § 1983 to enjoin the scheduled placement of Bibles on tables in the schools. After a brief hearing on February 24, 1995, the district court preliminarily enjoined appellees from providing access to the schools to any individual or group seeking to make Bibles available until a hearing could be held on the merits of appellants' challenge. A trial on a permanent injunction was then held on May 30, 1995, and on September 30, 1996, the district court issued a memorandum opinion and order vacating the preliminary injunction and denying a permanent injunction. J.A. at 3-7, 371-403.
 
 
 14
 In denying a permanent injunction, the district court held that the Upshur County School Board had not created a public forum in its schools, but had created "through policy and practice, ... a nonpublic or 'limited purpose' forum to which selective access is permitted for the purpose of enhancing the educational mission of the public schools." J.A. at 383. The court noted that under Lamb's Chapel, "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral," J.A. at 384 (quoting Lamb's Chapel, 508 U.S. at 392-93, 113 S.Ct. 2141). Because the Board had decided that distribution of Bibles was consistent with the educational mission of schools to expose children to a wide variety of views, the court concluded that plaintiffs were demanding that the court "enforce an impermissible viewpoint discrimination against religious material that the Board has concluded is consistent with the purpose of the forum." J.A. at 385.
 
 
 15
 The district court then held that making the Bibles available would not violate the Establishment Clause. The court first applied the "neutrality test," and concluded that the passive distribution of the Bible was permitted pursuant to a neutral government policy of providing access to the Upshur County schools for private expression consistent with the educational mission of the schools. J.A. at 392-94, 383-85. The Bible hand-out was private religious expression, not government speech, the district court reasoned, because it was privately sponsored and carried out by private citizens. J.A. at 393. The court also concluded that the Board's equal access policy did not discriminate in favor of Christianity--even if it incidentally benefitted Christian religions--because the policy allowed handouts of " 'religious materials' generally." J.A. at 394.
 
 
 16
 The district court also held that making the Bible available to students was not an impermissible endorsement of religion. The court concluded that a "reasonable student" would not be likely to view the Bible distribution as an endorsement because that student would know that the Board allows other organizations to distribute literature; because school personnel would not be involved in the distribution of the Bibles; because the signs on the tables would emphasize that taking a Bible was completely voluntary; and because an express disclaimer could be affixed that would further negate any appearance of endorsement. J.A. at 397-99. The court acknowledged that the Board's policy granted speakers access to a captive audience of Upshur County students, but found that
 
 
 17
 [t]he fact that school age children, presumably of all faiths, are compelled to be in close proximity to the forum is counterbalanced by the voluntary basis on which the religious materials will be made available. No student will be forced to take a Bible, and the mere fact that students might inadvertently come into contact with an unattended table full of free Bibles does not, in this Court's opinion, present a significant risk of perceived "endorsement" of Christianity in light of the general context in which the "reasonable student" will perceive the tables.
 
 
 18
 J.A. at 400. The court also found that the schools would have to take into account the "age appropriateness" of the Bible handout, perhaps implying that modifications of the plan might be required if the children were too young to distinguish between private and government speech.
 
 
 19
 The plaintiffs thereafter moved for a stay of the decision and reinstatement of the preliminary injunction pending appeal. On October 24, 1996, the district court declined to reinstate the injunction because it concluded that the injunction would violate the First Amendment rights of those citizens who wanted to make the Bibles available. The district court did, however, enjoin the Board to post a disclaimer sign on the tables with language substantially as follows:
 
 
 20
 These materials are neither sponsored nor endorsed by the Upshur County Board of Education, its agents or employees. The views and information contained in the materials do not reflect the approval nor disapproval of this Board or the school administration.
 
 
 21
 J.A. at 411-12.
 
 
 22
 Appellants have appealed the district court's denial of injunctive relief, but the Board has not appealed the district court's injunction that a disclaimer be placed on the tables on which the Bibles are displayed. Accordingly, we consider the constitutionality of the Bible displays with the above-quoted disclaimers affixed.
 
 II.
 
 23
 The Supreme Court has, over the past decade, consistently sustained against Establishment Clause challenge neutral government policies that permit private religious speech on and within state educational and other properties on the same terms as private secular speech is permitted. See, e.g., Rosenberger v. Rector of University of Virginia, 515 U.S. 819, 115 S.Ct. 2510, 2520-25, 132 L.Ed.2d 700 (1995) (holding that university could pay the publication expenses of a student Christian newspaper in accordance with its general policy of funding student newspapers); Capitol Square Review and Advisory Board v. Pinette, 515 U.S. 753, 115 S.Ct. 2440, 2447-50, 132 L.Ed.2d 650 (1995) (plurality) (holding that a state could, pursuant to a "religiously neutral" policy, permit a private party to display a cross in a traditional public forum located next to the state's seat of government); id. 515 U.S. at 770-74, 115 S.Ct. at 2451-52 (O'Connor, J., concurring in part and concurring in the judgment); Lamb's Chapel, 508 U.S. at 395-97, 113 S.Ct. 2141 (holding that a school could allow after-hours access to its facilities to a religious group when the school had made its facilities generally available to a wide variety of public organizations); Mergens, 496 U.S. at 247-53, 110 S.Ct. 2356 (1990) (plurality) (holding that a high school could officially recognize a student religious club and afford it the same benefits as other student clubs); id. at 260-62, 110 S.Ct. 2356 (Kennedy, J., joined by Scalia, J., concurring in part and concurring in the judgment) (same); Widmar, 454 U.S. at 270-75, 102 S.Ct. 269 (holding that a university could allow a student religious group to use university facilities that were generally available for activities of student groups). Indeed, the Supreme Court has recently affirmed that the neutrality of a government program is a "significant factor in upholding [it] in the face of Establishment Clause attack." Rosenberger, 115 S.Ct. at 2521. As the Court has said, government acts neutrally if it acts for some purpose other than advancing religion, see id. 515 U.S. at 839-40, 115 S.Ct. at 2522, and if, when it opens a forum for private speech, it respects the distinction between government speech and private speech endorsing religion by refraining from encouraging any mistaken impression that the private speakers speak for the government, see id. 515 U.S. at 841-43, 115 S.Ct. at 2523. The Upshur County School Board's policy herein challenged satisfies both of these requirements.
 
 A.
 
 24
 The Board's policy is neutral because it was plainly adopted, not to advance religion, but for the secular purpose of "open[ing] a forum for speech," id. 515 U.S. at 839-41, 115 S.Ct. at 2522, in order to further the schools' educational mission. At the conclusion of a full bench trial, the district court specifically found that the Board's "express purpose" for its practice of "allow[ing] private speakers to access the public schools" is to "enhance [the students'] education by exposing them to a broad spectrum of knowledge." J.A. at 384. The Supreme Court has repeatedly held that such "an open-forum policy, including nondiscrimination against religious speech, [has] a secular purpose." Widmar, 454 U.S. at 271, 102 S.Ct. 269 (footnotes omitted); see also Mergens, 496 U.S. at 248, 110 S.Ct. 2356 (plurality).
 
 
 25
 Appellants argue that the Board did not adopt a general "policy creating a forum for the distribution of materials enlarging student thought and knowledge," Appellants' Brief at 13, but merely approved a motion instructing the Superintendent to meet with McDaniels to arrange a day for making Bibles available, id. at 27, in order to appease a "vocal" group of Christian constituents, id. at 40-41. Thus, appellants argue, the Board's decision to allow Bibles to be made available was not facially neutral, but rather exhibited a "facial preference for Bibles," id. at 28.
 
 
 26
 The Board's decision, however, must be viewed against the backdrop of the Board's existing policy, which appellants would have the court wholly ignore. Although, as noted, the Board had not adopted a written policy allowing the distribution of private material in the schools, the well established, historical practice of the Board was to allow distribution of such material (subject only to routine administrative review for age appropriateness), but to forbid distribution of religious and political material altogether. The district court found that the Board had adopted this ban on the distribution of religious literature, not because it believed that such literature was inconsistent with the purpose of the school forum, but "[s]olely" because it believed "that allowing Bibles to be distributed was a violation of the Establishment Clause." J.A. at 384-85. When, in light of the Supreme Court's more recent precedents, McDaniels and other private citizens requested that they be allowed to make Bibles available, the Board was persuaded by their argument that the Establishment Clause did not require the Board's existing policy of complete exclusion of religious materials and discrimination against religious speech and, therefore, granted the citizens' request. J.A. at 385. And, indeed, the Supreme Court's decisions that had been rendered since the 1989 adoption of the Board's policy, including Lamb's Chapel and Mergens, had confirmed not only that the state could allow private religious speech in a state forum governed by a neutral policy of equal access, but that discrimination against religious speech in such a forum could violate the First Amendment. Even appellants concede that the Board's 1989 policy, as originally interpreted, may well have been unconstitutional. See Appellants' Reply Brief at 9.
 
 
 27
 Accordingly, as the district court found, when the Board acted to eliminate the absolute prohibition on private religious literature in the schools, "the Board was not exhibiting any favoritism" for religion in general or Christianity in particular, but was simply lifting one forum restriction on religious speech to which most other speech had never been subject and thereby "permitting the distribution of Bibles and other religious material similar in character to material already permitted." J.A. at 385. Cf. Capitol Square, 115 S.Ct. at 2447 (plurality) ("We find it peculiar to say that government 'promotes' or 'favors' a religious display by giving it the same access to a public forum that all other displays enjoy."). As Board member Martha White Feola explained, "the intention was to offer choices to children, not [to] put[ ] Bibles in their hands or any other religious materials." J.A. at 138.
 
 
 28
 And, indeed, the Board's December 1994 interpretation of the word "distribute" in its 1989 policy on its face applies equally to all religious speech and to political speech, as well--the only two categories of speech restricted and disadvantaged by the 1989 policy. Superintendent Westfall confirmed that the Board's policy clarification reaches all speech restricted by the 1989 policy, that the Board's position at its December meeting was that "other materials would be made available equitably with the Bibles," J.A. at 225, and that the Board intended, by affirming a broad equal access policy, "to provide equal availability to any other group that chose to offer to make materials available to students," J.A. at 22, 109-110. See also J.A. at 128, Testimony of Superintendent Westfall ("[The Board's] understanding from the outset of this issue [was] that other groups would have equal access to follow the same procedure" for making literature available.); J.A. at 109-10, Testimony of Superintendent Westfall (stating that the Board communicated to those who attended the December 1994 Board meeting that groups that wanted to distribute other religious material would have equal access to the schools). The Board clearly recognized that it was creating an "open forum," to which political groups, adherents of all faiths, individuals opposed to religion, and others with a "certain perspective they want to make available to students" will share access. J.A. at 128-29. The record that we have before us thus provides every "assurance that the next similarly situated group seeking" access to the Upshur County school forums will receive access on the same--if not more favorable--terms than those under which McDaniels' group was provided access. Board of Education of Kiryas Joel Village School District v. Grumet, 512 U.S. 687, 703, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994).
 
 
 29
 In fact, rather than elevating religious speech to a preferred status, the Board's policy clarification still leaves private religious speech at a disadvantage vis-a-vis most other speech, because it precludes religious speakers from delivering their messages to Upshur County students face-to-face. The Board has also imposed numerous other restrictions on religious speech, in order to minimize Establishment Clause concerns, including, significantly, limiting religious speakers to a single day during the year on which to make their literature available, requiring an explicit disclaimer, and instructing principals to ensure compliance with the strict guidelines governing the displays of religious materials. From all of these actions, it is evident that the Board has made a good faith effort to recognize the legitimate claim of its religious citizens under recent Supreme Court precedent not to be discriminated against in the Upshur County school forums, while attempting to mitigate the risk of "abuses involving direct contact with students and potential religious proselytizing in the classroom," Appellees' Brief at 35.
 
 
 30
 The fact that the motion approved by the Board was directed only to making Bibles available is neither surprising nor troubling. The Board was simply acting on the one request to make literature available that its constituents had placed on its agenda. Had the Board also received requests by citizens to make the Koran, or the Book of Mormon, or political materials available, it must be presumed that the Board would have granted those requests by motion as well.
 
 
 31
 Nor is the fact that McDaniels' request to offer the Bibles was religiously motivated ultimately relevant to our inquiry as to the permissibility of the Board's action. We do not impute an impermissible purpose to advance religion to an elected official merely because he responds to a religiously motivated constituent request, and the record is absolutely devoid of any evidence that would suggest that any Board member's vote was religiously motivated. As the district court noted, J.A. at 388, appellants do not even contend that the Board was religiously motivated in allowing private citizens to offer the Bibles to the County's students; appellants argue only that the decision was politically motivated.
 
 
 32
 In sum, by accommodating its constituents' request that religious speech be allowed at least limited access to the Upshur County open school forums, the Board did nothing more than affirm "the right of religious speakers to use [the Upshur County school] forums on equal terms with others," Widmar, 454 U.S. at 272 n. 12, 102 S.Ct. 269, and the Supreme Court has explicitly held that "prevent[ing] discrimination against religious and other types of speech" in a school forum is an "undeniably secular" purpose. Mergens, 496 U.S. at 249, 110 S.Ct. 2356 (plurality).
 
 B.
 
 33
 The neutrality of the Board's action is evidenced, not only by its secular purpose of reducing the extent of discrimination against religious speech, but also by the fact that the Board has affirmed and maintained the distinction between its own speech and the private religious speech that occurs in the school forum by acting affirmatively to discourage any mistaken impression that the private speakers are speaking for the Board or the schools. See Rosenberger, 115 S.Ct. at 2522-23. In Rosenberger, the Supreme Court concluded that the University of Virginia had not fostered any mistaken impression that the views printed in the student publications it funded were its own, because the University made clear to the student publishers that funding should not be misinterpreted as responsibility for or approval of their publications, and because it required the student publications to include a written disclaimer, which made clear to readers that the publications were independent of the University. See id. 515 U.S. at 823-25, 115 S.Ct. at 2514; cf. Mergens, 496 U.S. at 251, 110 S.Ct. 2356 (plurality) ("To the extent a school makes clear that its recognition of [a student religious club] is not an endorsement of the views of the club's participants, students will reasonably understand that the school's official recognition of the club evinces neutrality toward, rather than endorsement of, religious speech.") (citations omitted).
 
 
 34
 The Upshur County School Board has taken similar "pains to disassociate itself from the private speech" at issue in this case. Rosenberger, 115 S.Ct. at 2523. The Board has informed McDaniels and his supporters that it is allowing them to make Bibles available because it has an equal access policy and does not wish to discriminate against religious speech, not because the Board wants students to embrace the religious message of the Bible. See, e.g., J.A. at 25. Additionally, the Board has taken significant steps to prevent Upshur County students from mistakenly concluding that the Board is sponsoring the Bible display by requiring, in accordance with the district court's injunction, that disclaimers be placed on the tables that explicitly state that the schools are neither endorsing nor sponsoring the display, and by setting strict guidelines which forbid any school teacher or employee from participating in any way in making the Bibles available.
 
 
 35
 Appellants advance two arguments that the Board has, notwithstanding these prophylactic steps, impermissibly blurred the line between private religious speech and government speech, such that the Bible displays are fairly attributable to the schools themselves. First, appellants argue that the state has, in essence, transformed the private religious expression at issue in this case into government speech by allowing it to occur in school during school hours when state law mandates student attendance, thereby compelling a "captive audience" of students to receive the religious message. Appellants' Brief at 17, 35-40 ("[W]hen the government creates a captive audience through compulsory attendance laws and turns that audience over to a private religious group, the government is not merely a passive conduit for expression ... but is a participant."). The Board has not, however, compelled any student to hear or receive the religious message of the Bible. The Bibles are not distributed in the formal classroom setting, are not part of classroom activities, and are not part of the schools' curriculum. No student is required or even encouraged to pick up a Bible, much less to read one. In fact, both school employees and the private citizens organizing the Bible display are affirmatively forbidden from, in any way, pressuring or even encouraging students to take Bibles.
 
 
 36
 Of course, the very fact that the Bibles are available may be thought to convey a religious message to Upshur County students--one which students may inadvertently and involuntarily receive if they walk through the particular area in which the Bibles are displayed. Appellants argue that this message, at least, must be attributed to the government because the state effectively compels students to receive the message by compelling their school attendance. However, this message, too--if received at all--is received during "noninstructional time," when students are in the hall or library outside of the structured classroom setting. Mergens, 496 U.S. at 251, 110 S.Ct. 2356 (plurality). Moreover, the Supreme Court has never held that the mere fact that private religious speech occurs during school hours is sufficient to render it state speech. Indeed, the Court implicitly rejected this suggestion in Mergens when it treated the speech of religious clubs at a high school as private religious expression, despite the fact that the official school recognition of the clubs mandated by the Court's opinion would guarantee the religious clubs "access to the school newspaper, bulletin boards, the public address system, and the annual Club Fair." Id. at 247, 250-51, 110 S.Ct. 2356.
 
 
 37
 Undoubtedly, the distribution of the school newspaper, student viewing of school bulletin boards, and announcements over the public address system about official club activities all occurred during school hours. Nevertheless, the Mergens plurality and Justices Kennedy and Scalia in concurrence were apparently neither troubled nor swayed by Justice Marshall's concern that "[t]he comprehensiveness of [this access] highlight[ed] the Establishment Clause dangers posed by" conferring official school recognition on high school religious clubs. Id. at 268, 110 S.Ct. 2356 (Marshall, J., concurring in the judgment).
 
 
 38
 The imposition on a student from seeing a privately sponsored table of Bibles in the hallway during one day of the school year is, we are satisfied, no greater than that from seeing signs advertising a religious club on the school's bulletin boards or hearing broadcasts about the clubs over the public address system every day, and the argument for attributing the religious speech to the government is no greater in the former situation than in the latter. The only message fairly attributable to the government in either case is that private speech will be allowed in the forum on a nondiscriminatory basis.
 
 
 39
 Second, appellants argue that Upshur County schools are not public forums for private speakers, but are in fact "tightly controlled nonforum[s]" to which the Board allows access on a discretionary basis only to speech that it deems age appropriate, not harmful to students, and not disruptive to the school environment. Appellants' Brief at 19. Consequently, appellants contend, all of the speech allowed in the Upshur schools has been approved or "endorsed" by the Board, reflects the Board's view of what is appropriate for students to hear, and, as a result, becomes--in some sense--the Board's speech. See id. at 19, 33. We cannot accept this argument that the mere fact that the school, quite properly, retains the prerogative to exclude from its halls speech that threatens its educational mission means either that the Bible sponsors speak for the Board or that the Board is fostering the mistaken impression that they do.
 
 
 40
 The government need not be administering a "public forum" or even a "limited public forum" as those terms are understood in free speech jurisprudence in order for it to allow private religious expression on a neutral basis without violating the Establishment Clause. See, e.g., Lamb's Chapel, 508 U.S. at 391-93, 395, 113 S.Ct. 2141 (declining to decide whether school facilities were a "public forum" or a "nonpublic forum" because, in either event, the schools were required by the Free Speech Clause to allow religious groups to use those facilities on equal terms and providing such equal access would not violate the Establishment Clause); Widmar, 454 U.S. at 267, 102 S.Ct. 269 (holding that a university could not discriminate against religious speech in a "generally open" forum); Mergens, 496 U.S. at 241-42, 246-48, 110 S.Ct. 2356 (plurality) (holding that even though the school might not be the kind of "limited public forum" recognized in Widmar, it was a "limited open forum" as defined by Congress under the Equal Access Act and the school was thus required to allow religious clubs and could do so without violating the Establishment Clause).
 
 
 41
 In fact, it is well established that "schools do not endorse everything they fail to censor," Mergens, 496 U.S. at 250, 110 S.Ct. 2356 (plurality), even when the school is administering a forum that is "explicitly designed to advance the school's interest in shaping the character of its students," id. at 268, 110 S.Ct. 2356 (Marshall, J., concurring in the judgment). Like the Board in this case, the school district in Mergens did not have a written policy governing the formation of student clubs, but, in practice, it allowed those clubs whose "goals and objectives [were] consistent with school board policies and with the school district's 'Mission and Goals'--a broadly worded 'blueprint' that expresses the district's commitment to teaching academic, physical, civic, and personal skills and values." Id. at 232, 110 S.Ct. 2356 (plurality).
 
 
 42
 The plaintiffs in Mergens contended that because the clubs were obviously "an integral part of [the school's] educational mission, official recognition of [a religious club] would effectively incorporate religious activities into the school's official program, endorse participation in the religious club, and provide the club with an official platform to proselytize other students." Id. at 247-48, 110 S.Ct. 2356. Justice Marshall, joined by Justice Brennan, agreed that, because the "school's message with respect to its existing clubs [was] not one of toleration but one of endorsement," id. at 265, 110 S.Ct. 2356 (Marshall, J., concurring in the judgment), the school was required to take special steps to "fully dissociate itself from [the proposed religious] club's religious speech and avoid appearing to sponsor or endorse the club's goals," id. at 270. Justice Marshall would have required the school either to "entirely discontinue encouraging student participation in clubs and clarify that the clubs are not instrumentally related to the school's overall mission" or "to continue its general endorsement of those student clubs that did not engage in controversial speech," but to "affirmatively disclaim[ ] any endorsement of the Christian club," id.
 
 
 43
 However, a majority of the Court in Mergens unmistakably rejected the plaintiffs' and Justice Marshall's position, and held that it would not violate the Establishment Clause for the school to allow religious clubs without changing its existing policy. See Mergens, 496 U.S. at 248, 110 S.Ct. 2356 (plurality); id. at 260-62, 110 S.Ct. 2356 (Kennedy, J., joined by Scalia, J., concurring in part and concurring in the judgment). Certainly, to allow religious clubs under that policy, the school in Mergens would have to find, implicitly at least, that student participation in religious activities is consistent with the school's view of appropriate student character development. Cf. id. at 261, 110 S.Ct. 2356 ("I should think it inevitable that a public high school 'endorses' a religious club, in a commonsense use of the term, if the club happens to be one of many activities that the school permits students to choose in order to further the development of their intellect and character in an extracurricular setting."). Nevertheless, as Justice Kennedy explained, "no constitutional violation occurs if the school's action is based upon a recognition of the fact that membership in a religious club is one of many permissible ways for a student to further his or her own personal enrichment." Id.
 
 
 44
 Similarly in this case, the Board's decision that religious speech is one of many kinds of speech that is consistent with the schools' educational mission and that is appropriate for students to hear if they so choose does not evince the favoritism of religion that the Establishment Clause condemns. Rather, to require the Board to exclude religious literature as such from the forum it has created to further the schools' educational mission by exposing the county's students to a variety of age appropriate private speech would evince the hostility toward religious speech that the Establishment Clause does not require and that the Free Exercise and Free Speech Clauses forbid. See, e.g., id. at 248, 110 S.Ct. 2356 (plurality) ("The Establishment Clause does not license government to treat religion and those who teach or practice it, simply by virtue of their status as such, as subversive of American ideals and therefore subject to unique disabilities.") (quoting McDaniel v. Paty, 435 U.S. 618, 641, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) (Brennan, J., concurring in the judgment)) (internal quotation marks omitted); Rosenberger, 115 S.Ct. at 2525 (O'Connor, J., concurring) ("Withholding access would leave an impermissible perception that religious activities are disfavored ...; if a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion."); Kiryas Joel, 114 S.Ct. at 2498 (O'Connor, J., concurring in part and concurring in the judgment) ("The Religion Clauses prohibit the government from favoring religion, but they provide no warrant for discriminating against religion.").
 
 
 45
 Of course, if the Board "manipulate[d] its administration of" the forum through its residual discretion to exclude harmful, disruptive, or age inappropriate materials, so as to give "preferential access" to religious groups or so as to ensure "that only certain religious groups take advantage of it," then that "governmental favoritism" of religious speech would violate the Establishment Clause. Capitol Square, 115 S.Ct. at 2448-49 (plurality). The record is devoid of any evidence, however, that the Board has applied its forum standards in a manner that discriminates in favor of Bibles or against other religious materials or non- or anti-religious materials. Absent such evidence, we refuse to impute to the Board the unconstitutional intent to favor religion. We presume that the Board will administer the Upshur County school forums in accordance with the dictates of the Constitution.
 
 C.
 
 46
 Despite all of appellants' broad arguments to the contrary, appellants themselves concede, as they must, that the Upshur County schools could, as a general matter, permit private distribution of religious materials pursuant to a neutral, open access policy because "[a]n open access policy 'does not confer any imprimatur of State approval on religious sects or practices' ... because the forum is available to a broad class of nonreligious as well as religious speakers." Appellants' Reply Brief at 20 (quoting Appellees' Brief at 35); see also Appellants' Brief at 38 ("If ... the Board had requests from a wide spectrum of private groups wanting to make mass distributions of free books to students, then it might be able legitimately to decide to accommodate those requests, including requests from religious groups to distribute religious materials."). Because the Board has, in fact, adopted such a neutral, equal access policy, appellants' case against the Board's decision to allow passive distribution of religious materials reduces to the single, factual assertion that Christian religious speech is dominating and will always dominate the Upshur County school forums. See Appellants' Brief at 29-33. According to appellants, this alleged domination means that "even if the Upshur County Board has a policy that sa[ys] any private groups or citizens [can] distribute their books to the county's school children, that policy would still violate the Establishment Clause," because the only groups who have taken advantage of the equal access policy and are likely to take advantage of it in the future are Christians who want to make Bibles available. Id. at 30.
 
 
 47
 Justice O'Connor has suggested that, "[a]t some point, ... a private religious group may so dominate a public forum that a formal policy of equal access is transformed into a demonstration of approval," and that the resulting "endorsement" of religion violates the Establishment Clause. Capitol Square, 115 S.Ct. at 2454 (O'Connor, J., concurring in part and concurring in the judgment). Even assuming, however, that a neutral government policy of equal access may be converted into government favoritism toward religion if religious groups are the only speakers who choose to use the forum, we doubt that the passive distribution of Bibles on a single day during the year, when other material is distributed freely and actively throughout the year, could ever constitute impermissible domination of a forum, even in the absence of other speech similar to the Bible. But, in any event, appellants' argument that the Bible or other religious speech will dominate Upshur County's forums lacks factual support in the record and is both premature and speculative.
 
 
 48
 Appellants all but concede not only that there is a sufficiently vigorous exchange of informational announcements and pamphlets in the Upshur County schools that the schools could allow distribution of religious materials of a "similar" character, but also that the schools would risk unconstitutionally discriminating against religious speech were they to exclude such religious materials. See Appellants' Reply Brief at 9 (noting that the schools could encounter constitutional "difficulties if they refused to distribute 'religious' materials that were analogous to informational announcements by the scouts, 4-H, or the Little League"). Thus, appellants' argument that Christian religious speech is dominating the Upshur county school forums depends on their characterization of passive Bible distribution as a radically different form of speech than has historically occurred in the Upshur forums. Appellants argue that "youth activities groups--the scouts, 4-H, and Little League" and "their literature are so dramatically different from a coalition of churches (or of just private citizens) handing out Bibles that they cannot possibly provide an antidote for the religious message of the defendants' action in permitting the Bible distribution." Appellants' Reply Brief at 4. Even indulging appellants' intimation that private religious speech in a generally open school forum is a poison in need of "antidote," we are not persuaded that the difference between books, on the one hand, and pamphlets on the other, is of constitutional moment. Nor do we understand how the character of the private speaker is relevant to our analysis.
 
 
 49
 Moreover, and perhaps most important for resolution of the particular case before us, even if there is a constitutionally significant difference between Bible distribution and distribution of the type of literature previously made available in the Upshur schools, appellants' argument would nonetheless be premature. The Board only recently clarified its 1989 policy so as to open the Upshur County school forums to a much broader spectrum of speech--including religious and political speech--than traditionally has had access to the Upshur County schools, and it was only during the process leading to this clarification that the Board actually affirmed that the Upshur County schools are "open forum[s]" that welcome a wide variety of private speech. We cannot hold that the Board's policy of providing equal forum access to private speakers violates the Establishment Clause simply because the first speaker in the forum happens to deliver a religious message, any more than we could hold that the Equal Access Act sustained in Mergens would be unconstitutional as applied to the approval of a religious club simply because it was the first to apply for recognition under a school policy allowing students to establish official, noncurricular clubs. Any such holding would exhibit an antipathy toward religious speech both at odds with our religious heritage and forbidden by our Constitution.
 
 
 50
 Implicitly conceding the weakness of any contention that the constitutionality of the Upshur County forum turns solely on the fortuity that the first speaker in the forum was religious, appellants emphasize at every turn that citizens distributing Bibles are likely to be the only religious (or political) speakers that will ever enter the Upshur schools under the Board's policy. Thus, appellants are at pains to frame the issue before us as
 
 
 51
 [w]hether a county school board violates the Establishment Clause of the First Amendment to the United States Constitution by permitting a private religious group to use the public schools to make Bibles available, during the school day, to all of the county's school children when no similar distributions, for books other than Bibles, have ever occurred in the school system or are likely to occur there in the future.
 
 
 52
 Appellants' Brief at 1-2 (emphasis added); see also id. at 32 (arguing that, in Upshur County, "where the Bible has been the only noncurricular book distributed to Upshur County students in the systems's history and where that is likely to remain the case, the reasonable student, seeing the table with Bibles ..., will naturally conclude that the Bible is a book favored by the county's officialdom") (emphasis added); id. at 9 ("No organization, however, had ever requested the opportunity (before or after the Board's December vote) to distribute or make available in the schools any piece of substantive literature other than Bibles."). Appellants' unsupported prognostications, however, are nowhere close to the "empirical evidence that religious groups will dominate [the] open forum," Mergens, 496 U.S. at 252, 110 S.Ct. 2356 (plurality) (quoting Widmar, 454 U.S. at 275, 102 S.Ct. 269), which might serve to invalidate the county's facially neutral policy.
 
 
 53
 Appellants argue that the fact that no groups other than McDaniels' have requested that they be allowed to distribute "substantial" literature in the Upshur schools since the Board clarified its policy confirms that no such requests are likely ever to be forthcoming. However, this is precisely the case where there is every reason to believe that the future will not necessarily resemble the past. The Board's clarification of its equal access policy is relatively recent and has been under legal attack almost from its inception. Appellants filed this suit less than three months after the December 1994 policy interpretation and little more than a week after Superintendent Westfall first met with McDaniels to arrange a date for making the Bibles available. J.A. at 3, 94. The policy was then preliminarily enjoined until just over a year ago, after which time this appeal has been pending.
 
 
 54
 It is hardly surprising that the Board has not been flooded with requests for permission to distribute literature in the Upshur schools pursuant to the new policy. Once this legal challenge is resolved, it would stand to reason that any number of groups will choose to take fuller advantage of the Upshur County school forums. And even relatively limited participation by other groups would, in our view, prevent a one-day passive Bible distribution from dominating the school forums.
 
 
 55
 In other words, given the chance, the Upshur school forums may well become the broad forums that the Board envisioned when it interpreted its policy to further advance the schools' educational mission by expanding the scope of ideas to which Upshur students are exposed. J.A. at 226-28. Even appellants concede that religious participation in such a forum would withstand Establishment Clause attack and, indeed, that religious speech could not constitutionally be excluded from such a forum. See Appellants' Brief at 38; Appellants' Reply Brief at 9. As we held in Fairfax Covenant Church v. Fairfax County School Board, 17 F.3d 703, 708 (4th Cir.1994):
 
 
 56
 [E]mpirical evidence of domination ... is not fulfilled by ... anxiety or concern about whether the empirical circumstances could exist in the future. Mere speculation that a nonexclusive access to a public forum might ripen into a violation of the Establishment Clause, absent any facts suggesting that probability, is not a justification sufficiently compelling to burden free access to the forum.
 
 
 57
 Id. at 708 (emphasis added). Just as "[w]ithholding access [to an open forum] would leave an impermissible perception that religious activities are disfavored" and "would demonstrate not neutrality but hostility toward religion," Rosenberger, 115 S.Ct. at 2525 (O'Connor, J., concurring), so to would prematurely intervening to exclude religious speech from a newly established open forum based on sheer speculation that the religious speech might someday so dominate the forum that an open-access policy would be transformed into a prohibited establishment of religion.
 
 D.
 
 58
 As should be evident from the foregoing discussion, we are convinced that the Board has neither coerced any student to participate in a religious activity nor impermissibly "endorsed" religion by allowing, under the circumstances described, the privately sponsored Bible displays for a single day during the year. "The inquiry with respect to coercion must be whether the government imposes pressure upon a student to participate in a religious activity." Mergens, 496 U.S. at 261, 110 S.Ct. 2356 (Kennedy, J., concurring in part and concurring in the judgment) (emphasis added). As we discussed earlier, the Board's action does not raise the specter of official coercion because neither the Board nor any other school employee will require or even encourage any student to pick up a Bible, much less to read one, and the Board has also expressly forbidden the private sponsors of the tables from imposing upon any student to take a Bible. The Bibles are made available outside of the formal classroom setting and students will be able to ignore or simply walk past the table set up in the hall or library--presumably without even calling any attention to that choice. Thus, no student will be put to the choice of "participating [in a religious exercise], with all that implies, or protesting." Lee v. Weisman, 505 U.S. 577, 593, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). We recognize that some "possibility of student peer pressure remains, but there is little if any risk of official state endorsement or coercion where no formal classroom activities are involved and no school officials actively participate." Mergens, 496 U.S. at 251, 110 S.Ct. 2356 (plurality).
 
 
 59
 Neither do we perceive any significant risk that a reasonable observer would believe that the schools were endorsing or favoring religion. Both Congress and the Supreme Court have recognized that at least secondary school students are capable of distinguishing between a school's equal access policy and school sponsorship of religion. See id. at 250-51, 110 S.Ct. 2356. And we believe that students are particularly capable of recognizing that distinction where, as here, a reasonable observer would know both that the school has allowed other private groups to distribute literature in the past and that those groups, and others, are "free to initiate" other displays in the future, id. at 252, 110 S.Ct. 2356; the tables displaying the Bibles are set up for only one day and are located outside of the classrooms in areas that the students can freely leave; no pressure is exerted on students to take Bibles; the tables bear an explicit disclaimer renouncing any school endorsement; and no teacher or other school employee is involved in any way in making the Bibles available.* As the Supreme Court itself has noted, "[t]he proposition that schools do not endorse everything they fail to censor is not complicated." Id. at 250, 110 S.Ct. 2356.
 
 III.
 
 60
 We hold, accordingly, that the state does not violate the Establishment Clause when it permits private entities to passively offer the Bible or other religious material to secondary school students on a single day during the year pursuant to a policy of allowing private religious and nonreligious speech in its public schools. In so holding, we are fully mindful of the unrivaled symbolic power of the Bible. We also recognize that there is an almost irresistible visceral temptation to raise the constitutional hurdle proportionately to the power of this text. But ultimately we are convinced that the power of a given religious text must be irrelevant to the constitutional analysis and that we cannot yield to the temptation to adjust the constitutional calculus depending upon the content of the particular religious material at issue. The Bible is no less deserving of the Constitution's protection than any other text of faith. And to hold otherwise would be indirectly to set us on a course of religious discrimination as antithetical to the values underlying the Establishment and Free Exercises Clauses as the direct establishment of a state church itself.
 
 
 61
 In the end, this case is not about the Bible, but about the principled application of established Supreme Court precedents which hold that the state may no more discriminate against, than it can establish, religion when it opens its facilities to private speech.
 
 
 62
 As to this issue, appellants all but concede that, prior to adoption of the policy they challenge today, the Upshur County School Board was unconstitutionally denying private religious speech the same access to the public schools that was afforded private nonreligious speech; they acknowledge that the state, once it opened the halls of its schools to private speech, could not discriminatorily ban private religious speech from those halls. Appellants even concede that, today, the Upshur County School Board may constitutionally permit private groups to offer the Bible and other religious materials in open forums of the Upshur County schools, because the imprimatur of the state is not conferred upon a religious message that is imparted by a private party in such forums. And appellants acknowledge, as the district court specifically found, that the County has invited private speakers into its public schools. Essentially, appellants' only argument is that Upshur County does not have a policy of open access that sufficiently "diffuses the religious impact" of the Bibles because the only persons who, thus far, have availed themselves of the School Board's new policy allowing the distribution of religious and political material are persons who wish to offer the Bible. Until and unless other speakers enter the open forum recently created by the Board, so the argument goes, private religious speech must be banned from the forum by the Constitution.
 
 
 63
 If Upshur County's newly created open forums in fact become so dominated by private religious speech that a genuine threat of an established religion becomes apparent--as appellants fear but at this point only speculate will occur--there will be time enough to address such an argument. In order for such an argument to prevail at this time, however, we would have to hold that private religious speech is forbidden by the Establishment Clause merely because it happens to be the first speech uttered in a state's open forum. Such a holding would represent an antipathy toward religion that the Establishment Clause does not require, and that the Free Exercise and Free Speech Clauses affirmatively proscribe.
 
 
 64
 The judgment of the district court is affirmed in part and reversed in part.
 
 
 65
 It is so ordered.
 
 
 66
 DIANA GRIBBON MOTZ, Circuit Judge, concurring in part and dissenting in part:
 
 
 67
 The Upshur County School Board permitted a group of ministers, politicians, and businessmen to distribute Bibles in all public elementary and secondary schools during regular school hours, when state law compels student attendance. Except as to the very youngest and most impressionable children, the majority concludes that this action did not violate the Establishment Clause. That holding is not just unprecedented; it also is contrary to both the spirit and the letter of controlling Supreme Court authority.
 
 
 68
 The Supreme Court has never held that the government can permit private groups to display sectarian religious materials, let alone distribute Bibles, in public schools while school is in session. Rather, the Court has repeatedly stressed the susceptibility of school children to the power of government and the pressure of peers in "enforc[ing] religious orthodoxy," Lee v. Weisman, 505 U.S. 577, 592-93, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), and has warned against the use of the Bible as an "instrument of religion" in the public schools, School Dist. of Abington Township v. Schempp, 374 U.S. 203, 224, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). Accord Stone v. Graham, 449 U.S. 39, 41 n. 3, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam); Edwards v. Aguillard, 482 U.S. 578, 608, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (Powell, J., concurring).
 
 
 69
 Because "[t]he State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure," the Court itself has pointed out the frequency with which it has been required "to invalidate statutes which advance religion in public elementary and secondary schools." Edwards, 482 U.S. at 584, 107 S.Ct. 2573. For example, the Court has prohibited as violative of the Establishment Clause not only an in-school Bible reading requirement, Schempp, 374 U.S. at 223-26, 83 S.Ct. 1560, but also the posting of privately financed copies of the Ten Commandments in public school classrooms, Stone, 449 U.S. at 39-41, 101 S.Ct. 192, the imposition of limitations on the teaching of evolutionary theory in public schools, Edwards, 482 U.S. at 586-96, 107 S.Ct. 2573; Epperson v. Arkansas, 393 U.S. 97, 104-09, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), the observance of a one-minute period of meditative silence or voluntary prayer during regular school hours, Wallace v. Jaffree, 472 U.S. 38, 55-61, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), and, most recently, the use of a short nonsectarian prayer at non-compulsory high school and middle school graduation ceremonies. Lee, 505 U.S. at 586-99, 112 S.Ct. 2649.
 
 
 70
 In this case, considering the context and history of the County, its schools, and the Bible distribution, a reasonable observer could only conclude that by permitting a private group to make Bibles available at all levels of the public school system--in the high schools, junior high schools, middle schools, and elementary schools--the Board effectively endorsed religion. The Establishment Clause prohibits this result. Accordingly, I respectfully dissent.
 
 I.
 
 71
 The majority opinion requires me to address two preliminary matters before reaching the heart of the Establishment Clause analysis.
 
 A.
 
 72
 The majority omits many essential--and undisputed--facts concerning the challenged Bible distribution. Knowledge of those facts is necessary for an understanding of the context of the Bible distribution, which in turn provides the basis for the Establishment Clause analysis. Those critical, uncontroverted facts are as follows:
 
 
 73
 First, and indisputably, the Bible was and is the only sectarian religious text--indeed, the only non-curricular book of any sort--that the Upshur County School Board has ever approved for distribution in the County schools. The Board adopted its 1989 policy in reaction to an in-school Bible distribution by the Gideons. Superintendent Lynn Westfall (a thirty-two-year veteran of the Upshur County schools) testified that after the Gideons "went into the classroom[s], talked to the students, and then handed the Bibles to the students," the Board approved its policy prohibiting the distribution of religious materials "advocating a particular religion, denomination, or the beliefs thereof" in the schools. A Board member further explained that the Board considered the Gideons' distribution "a problem" because "children were being coerced or pressured into accepting things." Moreover, when the Board adopted its 1989 policy it made no distinction between permitting groups to distribute religious materials (including Bibles) and permitting them to make available religious materials. (Similarly, I make no distinction herein between "distributing" and "making available.") The Board followed that policy--without exception--until it sanctioned the Bible distribution now at issue.
 
 
 74
 Second, after adoption of the 1989 policy, only four private groups distributed literature in the schools prior to the challenged Bible distribution: the Little League, the Boy Scouts, the Girl Scouts, and the 4-H Club. (Some twenty years earlier, the Women's Christian Temperance Union had distributed some literature in the schools, but that distribution had not been repeated in recent times.) These four groups, recognized by the Superintendent as "quasi-educational," "[y]outh service, youth activity-oriented groups," distributed "informational announcements and pamphlets" regarding membership and activities. Although the public schools in Upshur County and throughout the state commonly receive requests to distribute Bibles, the four groups granted access neither requested nor received permission to distribute Bibles, sectarian religious texts, books espousing theological or religious principles, or, in fact, books of any kind.
 
 
 75
 Third, the circumstances leading to the Board's decision to permit the challenged Bible distribution remain uncontroverted. In August 1994, Reverend Eddie McDaniels, a local minister and radio talk show host, accompanied by a businessman and two state senators, asked to place Bibles on tables in public schools--to "make them available" to students. The group argued that "making the Bibles available" did not violate the Board's formal policy barring "distribution" of sectarian religious materials. Reverend McDaniels indicated to the Superintendent (who in turn reported to the Board) that "some of the people involved feel strongly enough about this issue that they may pursue it legally."
 
 
 76
 The Superintendent sought counsel from the Board's attorney, who advised that, although existing law did not "specifically prohibit" a private group from making the Bibles available, the Board should deny the request and adhere to its existing policy. The Superintendent reported this advice to the Board, along with his opinion that the Board should "stand[ ] firmly behind[the] existing policy," because "at the time that the Board adopted [the] policy, both distribution and [the making] availab[le] of Bibles were prohibited." In late October, the Superintendent shared the research with Reverend McDaniels' group, and suggested that the group distribute the Bibles through the Fellowship of Student Athletes, "a voluntary student group that meets off school hours," which, like other student clubs in the schools, could freely make Bibles (or other religious or non-religious literature) available to their fellow students. Reverend McDaniels' group rejected this suggestion.
 
 
 77
 After meeting with the Superintendent, Reverend McDaniels attempted to convince each member of the Board to permit the distribution of Bibles throughout the school system. He informed them that one of the members of his congregation, Tom Shaw, planned to publish a statement in the local paper urging citizens to vote against the upcoming school tax levy unless the Board sanctioned the Bible distribution. In exchange for a commitment to consider the distribution at their next Board meeting, Reverend McDaniels stated that he would try to halt publication of Shaw's statement. In response, one Board member suggested that the group distribute the Bibles through the parent-teacher organization, or at grocery stores, other business places, or at after school events. Reverend McDaniels again rejected these suggestions and the idea of distributing Bibles in the churches, explaining that "there are people who do not go to church that he could probably find in school."
 
 
 78
 When the Board resisted Reverend McDaniels' proposal, a large print, twelve-paragraph statement attacking the nondistribution policy appeared in the Record Delta, an Upshur County newspaper. That statement reads in pertinent part:
 
 WAKE UP UPSHUR COUNTY
 
 79
 . . . . .
 
 
 80
 The problem that confronts this community is an action taken five years ago by the county board of education that prohibits the distribution of Bibles in public schools.
 
 
 81
 . . . . .
 
 
 82
 The school board said it based its decision to stop the practice on the need for public schools to "remain neutral concerning matters of particular religious and political beliefs."
 
 
 83
 The board's decision would make sense if the Bibles were to be used in classrooms. That is not the intention of the distribution program. It is simply a way to make sure that every student has a [B]ible for personal use.
 
 
 84
 . . . . .
 
 
 85
 Guns have already made an appearance in some Upshur County schools. Is it not better to carry a Bible to school than a gun? And when did guns start appearing in our classrooms? They showed up only after the 1989 school board action to ban the distribution of [B]ibles.
 
 
 86
 Our school board should review this decision and reverse it as soon as possible. If it does not, we should remember their position the next time a special school levy comes up. We should vote to withhold our taxes until the school board comes to its senses.
 
 
 87
 We will have an opportunity to do just that when the school levy comes before us for a vote in November .
 
 
 88
 . . . . .
 
 
 89
 We must get Bibles back into the lives of our young people. Schools are the best place to distribute them because that's where the kids are. Let's make sure that this program is reinstated in Upshur County.
 
 
 90
 This Ad Paid for by Tom Shaw, HC78 Box 134, Rock Cave, WV 26234.
 
 
 91
 (Emphasis added).
 
 
 92
 Notwithstanding the newspaper statement, the Board refused to vote on the Bible distribution at its November meeting. Shortly thereafter the school tax levy was defeated in a close vote.
 
 
 93
 In early December, the Superintendent advised the Board that Reverend McDaniels had met with twelve to fifteen local ministers to discuss the Bible distribution, that money had been raised from local businesses to purchase Bibles, and that petitions were being circulated in the churches on Sunday in support of the Bible distribution. The Superintendent then proposed the Bible distribution plan at issue here as a "compromise." He acknowledged that "this action is contrary to the advice of our Board attorney," but stated that he thought "we will pay dearly if we do not make at least this minor concession."
 
 
 94
 More than 500 people attended the Board's December meeting (the usual attendance ranged from 30 to 40). Almost two dozen Upshur County Protestant churches presented the Board with petitions in favor of the Bible distribution. Reverend McDaniels, another clergyman, and several other citizens spoke at the Board meeting and the Superintendent recounted that "[t]he gist of the testimony was that the Bibles needed to be made available to students to improve morals, discipline in schools and to improve society in general."
 
 
 95
 Finally, it remains undisputed that, as recorded in the minutes of the December meeting, upon a motion duly made, seconded, and carried, "the Board instructed the Superintendent to meet with Mr. McDaniels to arrange a day for making Bibles available to students of Upshur County Schools based on the premise that making Bibles available to students and distributing Bibles to students are not the same." (Emphasis added). As the Superintendent acknowledged, the Board minutes from that meeting do not contain any suggestion that religious materials other than Bibles would be permitted in the Upshur County schools. And, as the Board concedes in its brief, the Superintendent and Board members admitted on cross-examination that "the only discussion among the Board was basically whether ... to make available was within or without the policy already in existence by the Board." Brief of Appellee at 8 (quoting the Superintendent). Specifically, the Board president conceded that no member of the Board or Administration ever mentioned--in all of the discussions prior to granting permission for the Bible distribution--that the 1989 policy "was going to be adopted, changed or interpreted in order to provide a broad forum for the free flow of ideas." He further testified that he had never "directed" the Superintendent "to bring a broad public forum into the schools of Upshur County," and during his tenure on the Board (since 1982), he had never suggested that "it might be a good idea to create a broad public forum" in the schools, nor did he recall other Board members making such a suggestion.
 
 B.
 
 96
 The other preliminary matter that I must note is the district court's express finding, accepted by the majority, that the Upshur County schools constitute a nonpublic forum.
 
 
 97
 In a traditional public forum--a public street or park--long "devoted to assembly and debate," Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the government can exclude a speaker "only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." Arkansas Educ. Television Comm'n v. Forbes, --- U.S. ----, ----, 118 S.Ct. 1633, 1641, 140 L.Ed.2d 875 (1998) (internal quotation marks omitted). Similarly, the government may create a designated or limited purpose public forum by opening public property "for use by the public as a place for expressive activity," which it may limit to "use by certain groups ... or for the discussion of certain subjects." Perry, 460 U.S. at 45, 46 n. 7, 103 S.Ct. 948. As long as a designated public forum retains its "open character," it "is bound by the same standards as apply in a traditional public forum." Id. at 46, 103 S.Ct. 948.
 
 
 98
 The government, however, retains significant power to limit private speech in a nonpublic forum--i.e., a "[p]ublic property which is not by tradition or designation a forum for public communication." Id. It can deny access to a nonpublic forum "on the basis of subject matter and speaker identity," id. at 49, 103 S.Ct. 948, if "the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). "In contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." Id. at 808, 105 S.Ct. 3439. If the characteristics of the private speaker seeking access to a nonpublic forum do not match the characteristics of the class of speakers to which the forum has been made selectively available, the government may exclude the speaker. See Arkansas Educ., --- U.S. at ----, 118 S.Ct. at 1642; Perry, 460 U.S. at 48, 103 S.Ct. 948 (in a nonpublic forum or even a designated public forum "the constitutional right of access ... extend[s] only to entities of a similar character").
 
 
 99
 After a thorough analysis properly based on "the history of the forum, the practice and policy of the Board, and the nature of the property," Peck v. Upshur County Bd. of Educ., 941 F.Supp. 1465, 1471 (D.W.Va.1996); see Cornelius, 473 U.S. at 802-05, 105 S.Ct. 3439, the district court found that the Board "had in place" a nonpublic forum to which it permitted "selective access ... for the purpose of enhancing the educational mission of the public schools." Peck, 941 F.Supp. at 1472. That finding was clearly correct. Public schools do not by nature possess the attributes of a public forum open for "indiscriminate use" by the citizenry or some segment thereof. See Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267-70, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). Nor does the Board's 1989 policy or historical practice in any way suggest that the Board intentionally designated the schools a public forum. Cf. Arkansas Educ., --- U.S. at ---- - ----, 118 S.Ct. at 1641-42. Thus, although my colleagues in the majority refer to the Board's creation of an "open forum," ante at 281, 283, 286-89, and an "open school forum," id. at 281, 286, they, too, accept the district court's finding that the Upshur County schools constitute a nonpublic forum. See id. at 278, 283.
 
 
 100
 Given this unquestioned and unquestionably correct finding; given that, in a nonpublic forum, the government need only afford similarly situated private religious groups the same access it has granted private groups lacking a religious viewpoint; and given that the Board granted access in the previous five years solely to private youth activity groups distributing informational literature, in my view, the Free Speech Clause did not require the Board to permit a group of clergy, politicians, and businessmen to distribute Bibles in the schools. But even if Reverend McDaniels' group did possess such a right, the Board could not constitutionally grant the group access to the schools if the distribution offended the Establishment Clause. This is so because "[t]here is no doubt that compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech." Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 115 S.Ct. 2440, 2446, 132 L.Ed.2d 650 (1995); see also Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); Widmar v. Vincent, 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981).
 
 
 101
 Consequently, in this case the importance of the district court's express finding--unchallenged by the majority--that the schools constitute a nonpublic forum does not lie in determining the group's Free Speech right of access; Reverend McDaniels' group has been given access. Rather, I emphasize the district court's finding that the schools constituted a nonpublic forum because the nature of the forum proves crucial to the Establishment Clause analysis, see infra § II.B.1, to which I now turn.
 
 II.
 
 102
 In Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court enunciated a three-part test to determine whether government action violates the Establishment Clause. To satisfy the prohibition against conduct that establishes religion, government action must: (1) have a secular purpose; (2) have as its "primary effect ... one that neither advances nor inhibits religion"; and (3) "not foster an excessive government entanglement with religion." Id. at 612-13, 91 S.Ct. 2105 (internal quotation marks omitted). A majority of the Court has recently reaffirmed the importance of Lemon 's "purpose" prong, and concluded that its "effect" and "entanglement" prongs rightly comprise a single inquiry. See Agostini v. Felton, 521 U.S. 203, 117 S.Ct. 1997, 2010, 2015, 138 L.Ed.2d 391 (1997). I first address the "purpose" and then the "effect" of the Board's action.
 
 A.
 
 103
 " 'The purpose prong of the Lemon test asks whether government's actual purpose is to endorse or disapprove of religion.' " Edwards, 482 U.S. at 585, 107 S.Ct. 2573 (quoting Lynch v. Donnelly, 465 U.S. 668, 690, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring)). "[T]he First Amendment requires that [government action] must be invalidated if it is entirely motivated by a purpose to advance religion." Wallace, 472 U.S. at 56, 105 S.Ct. 2479. Although the government must act with a "clearly secular purpose," still it may be "motivated in part by a religious purpose." Id. (citing Schempp, 374 U.S. at 296-303, 83 S.Ct. 1560 (Brennan, J., concurring)).
 
 
 104
 The majority holds that the Board's decision to permit the Bible distribution "was plainly adopted ... to further [its] educational mission." Ante at 279. Noting that the Board's 1989 policy enunciated its commitment to the "unrestricted pursuit of knowledge," the majority implies that the Bible distribution grew naturally from that policy. See ante at 279-81. But the uncontroverted facts offer no support for this theory. The Board adopted its 1989 policy, expressly barring the distribution of religious materials "advocating a particular religion, denomination, or the beliefs thereof," because of its concern that the previous Bible distribution (by the Gideons) resulted in coercion of students. The Board steadfastly followed that policy during the subsequent five years, and ultimately permitted the contested Bible distribution only in response to political strong-arming and threatened legal action, and only after initially deciding to stand by its nondistribution policy.
 
 
 105
 Furthermore, in view of the newspaper statement urging the Board to allow Bibles in the schools, the multiple petitions in favor of Bibles in the schools, the Board minutes recording the vote to permit a Bible distribution, and the Board president's acknowledgment that, prior to granting this permission, the Board never discussed creating a "broad" forum, the majority's reliance on post hoc testimony to conclude that the Board intended to create "an 'open forum' to which ... adherents of all faiths, individuals opposed to religion, and others ... will share access," ante at 280, is singularly unpersuasive.
 
 
 106
 In determining the purpose of challenged government action, the proper inquiry focuses on its stated purpose and history. See, e.g., Edwards, 482 U.S. at 586-87, 107 S.Ct. 2573. Although on occasion the Court has considered the trial testimony of those responsible for a challenged state action as to their motivation, see, e.g., Wallace, 472 U.S. at 57, 105 S.Ct. 2479, that practice has been criticized within the Court, see id. at 77, 105 S.Ct. 2479 (O'Connor, J., concurring); id. at 86-87, 105 S.Ct. 2479 (Burger, C.J., dissenting). Perhaps more important, the Court has never held that self-serving, after-the-fact testimony about motivation can establish a particular secular purpose when the government action itself and the events that led to it compel a different conclusion. After all, the stated purpose underlying governmental action must be "sincere and not a sham." Edwards, 482 U.S. at 586-87, 107 S.Ct. 2573. In this case, as one of the amici filing a brief in support of the Board notes, "Board members admitted at trial that the Board did not reach its decision for educational purposes but did so because of community pressure." Amicus Curiae Brief of Texas Justice Foundation at 11 (emphasis added).
 
 
 107
 The undisputed facts thus make the purpose inquiry closer than the majority suggests. The record undeniably demonstrates that Reverend McDaniels' group--who wanted to distribute a particular version of the Bible in the public schools "because that's where the kids are"--sought to "advance religion," and that the Board voted to permit the Bible distribution only after that group lobbied and petitioned the Board, and worked to defeat the school tax. These facts lead to the almost inescapable inference that the Board acted to appease the group. The Board's epiphany arose from its political sensitivities, not its educational sensibilities.
 
 
 108
 But does this conclusion translate to an improper purpose? The district court held it does not, Peck, 941 F.Supp. at 1473-74 n. 7; however, the parents who challenge the Bible distribution argue that the Board necessarily embraced the religious biases of Reverend McDaniels' group. They maintain that "when the Board acted solely with the design of appeasing the group ... the religious purpose of the group became the religious purpose of the Board." Brief of Appellants at 48. In support of this proposition the parents cite Palmore v. Sidoti, 466 U.S. 429, 432-34, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984), in which the Supreme Court held, in an equal protection context, that government cannot act to give effect to private biases.
 
 
 109
 Even if Palmore applies as suggested by the parents--and I think it does not, see Board of Educ. of Westside Community Sch. v. Mergens, 496 U.S. 226, 249, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (plurality opinion)--it provides no basis to conclude that the Board was "entirely motivated" to "advance religion," Wallace, 472 U.S. at 56, 105 S.Ct. 2479. As already noted above, I believe Reverend McDaniels' group had no right to distribute Bibles in the Upshur County schools. See supra § I.B. This conclusion does not, however, require that a court shut its eyes to the record. Reverend McDaniels' group asserted such a right and threatened suit to establish it. At the Board's request, its attorney researched the question and concluded that, although the distribution might cause Establishment Clause concerns, no law "specifically prohibited" it. The undisputed facts demonstrate that the Board's motivation stemmed at least in part from an aversion to a loss of needed revenue for the schools, from the familiar desire to avoid a lawsuit, and from an (erroneous) concern for accommodating the group's asserted right to access the schools. This undoubtedly satisfies the secular purpose criterion and the district court did not err in so finding.
 
 B.
 
 110
 That leads me to the final and most critical inquiry: did the Board's action have the "effect" of establishing religion?
 
 1.
 
 111
 Throughout its Establishment Clause jurisprudence, the Supreme Court has stressed the importance of both government "neutrality" and the avoidance of "endorsement" of religion. See, e.g., Schempp, 374 U.S. at 222, 83 S.Ct. 1560 ("neutrality"); Engel v. Vitale, 370 U.S. 421, 436, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) ("endorsement"). Recently, however, these words have been used to denominate two competing tests for determining whether, absent unlawful government coercion, government action in the context of a public forum has the effect of establishing religion.
 
 
 112
 Justice Scalia, joined by the Chief Justice and Justices Kennedy and Thomas, has espoused a "neutrality test," which the majority embraces and applies here. See ante at 279-85. Under this test, the government does not violate the Establishment Clause by permitting private religious speech "in a traditional or designated public forum, publicly announced and open to all on equal terms." Pinette, 115 S.Ct. at 2450 (plurality opinion). Rather, the government only violates the Establishment Clause if the challenged expression emanates from the government itself, or if the government actually "discriminate[s] in favor of [or against] private religious expression or activity." Id. 515 U.S. at 762-66, 115 S.Ct. at 2447-48.
 
 
 113
 Six other justices, including four members of the present Court, have rejected Justice Scalia's formulation. Instead, they have concluded that, even in the context of a public forum, the government's "impermissible message of endorsement can be sent in a variety of contexts, not all of which involve direct government speech or outright favoritism," and have analyzed Establishment Clause challenges using an "endorsement test," which "focuses upon the perception of a reasonable, informed observer." Id. 515 U.S. at 772-79, 115 S.Ct. at 2452-54 (O'Connor, J., concurring, joined by Souter and Breyer, J.J.); see also id. 515 U.S. at 796-817, 115 S.Ct. at 2464-74 (Stevens, J., dissenting); County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (five Justices finding the reaction of a "reasonable observer" relevant to determining whether the government had endorsed religion); id. at 620, 109 S.Ct. 3086 (opinion of Blackmun, J.); id. at 635-36, 109 S.Ct. 3086 (opinion of O'Connor, J., joined by Brennan and Stevens, J.J.); id. at 642-43, 109 S.Ct. 3086 (opinion of Brennan, J., joined by Marshall and Stevens, J.J.).
 
 
 114
 Under the endorsement test, "[w]here the government's operation of a public forum has the effect of endorsing religion, even if the governmental actor neither intends nor actively encourages that result, the Establishment Clause is violated." Pinette, 115 S.Ct. at 2454 (O'Connor, J., concurring) (internal citation omitted). This is so because "the State's own actions (operating the forum in a particular manner and permitting the religious expression to take place therein), and their relationship to the private speech at issue actually convey a message of endorsement." Id. It does not suffice to say that government has "refrain[ed] from encouraging," ante at 297, the perception of endorsement. "[T]he Establishment Clause forbids a State from hiding behind the application of formally neutral criteria and remaining studiously oblivious to the effects of its actions." Pinette, 115 S.Ct. at 2454 (O'Connor, J., concurring).
 
 
 115
 Although lines have thus been drawn as to the appropriate Establishment Clause test in the context of a public forum, no member of the Supreme Court has directly discussed the proper test in the context of a nonpublic forum like the Upshur County schools. However, the Court has indicated in several ways that the proper analytical tool in this context is the endorsement test.
 
 
 116
 To begin, the Court has never applied the neutrality test in any context other than a public forum, publicly announced as open to all on equal terms. The majority, although not entirely clear, seems to suggest otherwise. In the midst of applying the neutrality test, the majority relies on Lamb's Chapel, Mergens, and Widmar for the proposition that "government need not be administering a 'public forum' or even 'a limited public forum' as those terms are understood in free speech jurisprudence in order for it to allow private religious expression on a neutral basis without violating the Establishment Clause." Ante at 283 (emphasis added). The implication that the Supreme Court applied the neutrality test in Lamb's Chapel, Mergens, and Widmar is simply wrong.
 
 
 117
 In each of those cases, the Court applied the language and analysis of the endorsement test. See Lamb's Chapel, 508 U.S. at 391-95, 113 S.Ct. 2141 ("no realistic danger that the community would think that the District was endorsing religion" when after-school facilities were "repeatedly" used by a "wide variety" of private groups); Mergens, 496 U.S. at 231, 246-47, 250, 110 S.Ct. 2356 (plurality opinion) (when high school permitted "30 recognized [student] groups" to "meet after school hours on school premises" establishing a "limited open forum," students were "likely to understand that [the] school does not endorse ... student speech"); Widmar, 454 U.S. at 276-77, 102 S.Ct. 269 (doubtful that university students "could draw any reasonable inference of University support[for private religious speech] from the mere fact of [supplying] a campus meeting place" when university made its facilities available for meetings of "over 100 recognized [private] student groups" creating an "open" "public forum"). The Court's repeated use of the endorsement test, not the neutrality test, in cases involving forums far more open than the closely controlled nonpublic forum at issue here strongly suggests that the endorsement test and not the neutrality test applies in this instance.
 
 
 118
 Furthermore, seven members of the Court have given a clear signal that the neutrality test has no place outside the context of a public forum. Justice O'Connor, joined by Justices Souter and Breyer, has expressly noted the limited application of the neutrality test, concluding that it is only a proposed "exception to the endorsement test for the public forum context." Pinette, 115 S.Ct. at 2451 (O'Connor, J., concurring). Perhaps even more telling, Justice Scalia (the most vocal proponent of the neutrality test), joined by the Chief Justice and Justices Kennedy and Thomas, has carefully restricted its application to "a traditional or designated public forum, publicly announced and open to all on equal terms." Id. 515 U.S. at 768-70, 115 S.Ct. at 2450 (plurality opinion).
 
 
 119
 Thus, a majority of the Court, and, significantly, even those members espousing the neutrality test, has implicitly recognized that the nature of the forum provides a baseline for an observer's perception of the speech at issue. In a truly open, public forum with a wide array of messages, a greater expectation exists that citizens will understand government does not endorse any particular message--that the government acts neutrally. Conversely, in a nonpublic forum, where government exerts enormous control over the content of expression (and where the spectrum of private speech is circumscribed), it is far more likely that citizens will perceive a message of government endorsement, or lack of neutrality.
 
 
 120
 The forum at issue here obviously does not constitute "a traditional or designated public forum, publicly announced and open to all on equal terms." Id. Rather, as the district court expressly and correctly found, the Upshur County public schools, during school hours, constitute a nonpublic forum. Peck, 941 F.Supp. at 1471. See supra § I.B. Thus, whatever the validity of the neutrality test in the public forum context, and notwithstanding the majority's extensive reliance on it, the neutrality test does not provide the proper mode of analysis here; the endorsement test does.
 
 2.
 
 121
 "[T]he endorsement test necessarily focuses upon the perception of a reasonable, informed observer." Pinette, 115 S.Ct. at 2452 (O'Connor, J., concurring). "[W]hen [a] reasonable observer would view a government practice as endorsing religion" the practice must be held invalid. Id. 515 U.S. at 776-79, 115 S.Ct. at 2454. A reasonable observer is "deemed aware of the history and context of the community and forum in which the religious display appears," the importance vel non of the challenged display as a "religious symbol," the "general history" of the "public space in question" and how it "has been used in the past." Id. 515 U.S. at 779-83, 115 S.Ct. at 2455-56.
 
 
 122
 A single, inexorable conclusion emerges from applying the reasonable observer analysis in this case: the Board's action had the effect of endorsing religion. A reasonable, informed observer--aware of the Board's historical concern for the effect of permitting in-school Bible distributions, aware of the power of the Bible as an instrument of religious indoctrination, aware of the nonpublic nature of the forum (the public schools during school hours) and the control the Board retained over access to it, aware of the genesis of the Board's decision to permit the Bible distribution, and aware of the fact that the State compels student attendance during the Bible distribution--could not conclude otherwise.
 
 
 123
 First, a reasonable observer would know that in 1989 the Board adopted a written policy affirming the "unrestricted pursuit of knowledge" in the public schools, including the study of "religious and political ideas and works," but barring distribution of "[m]aterials advocating a particular religion, denomination, or the beliefs thereof." Moreover, the observer would know that the Board adopted this policy expressly to combat its concern that a previous Bible distribution resulted in children "being coerced into accepting things." The observer would also recognize that, prior to the Bible distribution at issue in this case, the Board consistently adhered to its 1989 policy--it never permitted the distribution of sectarian religious materials.
 
 
 124
 Second, as the district court recognized, a reasonable observer would understand the Bible's enormous "religious significance." Peck, 941 F.Supp. at 1477. More than just an "unrivaled symbol[ ]," ante at 288, the Bible is an "instrument of religion," Schempp, 374 U.S. at 224, 83 S.Ct. 1560, several orders of magnitude removed from the bulletin board or public address system announcements at issue in Mergens. Cf. ante at 282. A reasonable observer would know that Reverend McDaniels' group sought, and the Board permitted, distribution of a particular version of the Bible (the King James version), well recognized as having special significance to Protestant Christians. See, e.g., Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet, 512 U.S. 687, 114 S.Ct. 2481, 2509 n. 3, 129 L.Ed.2d 546 (1994) (Scalia, J., dissenting).
 
 
 125
 Certainly, "the Bible is worthy of study for its literary and historic qualities" and so, without violating the Establishment Clause, a school can present the Bible "objectively as part of secular program of education." Schempp, 374 U.S. at 225, 83 S.Ct. 1560. However, the Board does not contend that the Bible distribution here was instituted or carried out as part of the school curriculum. As the majority proclaims, "[t]he Bibles are not distributed in the formal classroom setting, are not part of classroom activities, and are not part of the school's curriculum." Ante at 282.
 
 
 126
 I recognize that people of good will may nonetheless wish that the public schools would instill in students veneration for the Bible and the principles it espouses. But the Supreme Court has specifically concluded that when, as here, privately financed religious expression in the public schools "serves no [ ] educational function" its only possible effect is "to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey." Stone, 449 U.S. at 42, 101 S.Ct. 192. The Court has held that "[h]owever desirable this might be as a matter of private devotion it is not a permissible state objective under the Establishment Clause." Id.
 
 
 127
 Third, a reasonable, informed observer would know that the Board consistently operated the school system as a nonpublic forum, retaining the authority to selectively deny access to inappropriate or harmful groups and affording access only to a few youth activity groups so that they could distribute informational pamphlets. No amount of obfuscation can change the fact that this case differs dramatically from the cases on which the majority so heavily relies. In those cases, the government granted many groups access to a forum, making the forum indeed "open," and then denied access to a similarly situated group solely on the basis of its religious perspective. See, e.g., Rosenberger v. Rector & Visitors of the Univ. of Virginia, 515 U.S. 819, 115 S.Ct. 2510, 2515-17, 132 L.Ed.2d 700 (1995) (when a state university provided a "limited public forum" to 118 student groups--15 of which were "student news ... or media groups"--it could not exclude a student journal solely because of the journal's "religious editorial viewpoint"); Lamb's Chapel, 508 U.S. at 393-95, 113 S.Ct. 2141 (when public "property had repeatedly been used by a wide variety of private organizations" likely creating a "limited public forum," the government could not deny access to a similarly situated group "solely because" of the "religious standpoint" of its speech); Widmar, 454 U.S. at 273-274, 102 S.Ct. 269 (when a university routinely made its facilities available for meetings of "over 100 recognized student groups," creating an "open" "public forum," it could not deny access to another recognized student group on account of the group's religious perspective alone).
 
 
 128
 In contrast, between 1989 and 1994 the Board allowed only four private youth activity groups access to the schools to distribute informational literature. Moreover, as the parents note, "nothing in the record[ ] indicate[s] that any of[those] groups sought access to the schools with any degree of regularity, let alone to a degree that would create a lively exchange of ideas, information, or concepts." Reply Brief at 4. Just as granting access to a wide variety of groups decreases the likelihood that a message of endorsement is conveyed, see Rosenberger, 115 S.Ct. at 2527 (O'Connor, J. concurring), so too granting access to a few groups substantially increases that likelihood.
 
 
 129
 Fourth, a reasonable observer would fully comprehend that the Board contravened its established policy and practice and permitted the Bible distribution to accommodate those who wanted Bibles in the schools, not to establish an "open" forum. That is, a reasonable observer would know that the Board voted to "instruct[ ] the Superintendent to meet with Reverend McDaniels to arrange a day for making Bibles available" in the public schools only after (1) the Board initially decided to affirm its 1989 policy barring all sectarian religious materials, (2) Reverend McDaniels heavily lobbied the Board to permit the Bible distribution, (3) one of Reverend McDaniels' congregants urged Upshur County voters "to withhold our taxes" unless and until the Board permitted the Bible distribution, (4) the school tax levy failed, (5) numerous Protestant churchgoers petitioned the Board to make Bibles available, and (6) the 500-plus crowd at the December meeting urged the Board to approve the Bible distribution.
 
 
 130
 Conversely, such an observer would also realize that, as the Board president testified, no one--including Board members--ever urged that the Board establish a broad, open forum, and when it permitted the challenged Bible distribution the Board did not think it was adopting, changing, or interpreting its policy to create such a forum. In fact, even after permitting the Bible distribution, the Board retained discretion to withhold access to inappropriate speakers. Thus, contrary to the majority's suggestion, in permitting the Bible distribution the Board did not create a "newly established open forum." Ante at 287. In admitting Reverend McDaniels' group, the Board acted, as the government did in Grumet, 114 S.Ct. at 2491, in a sui generis manner, which "gives reason for concern whether the benefit received ... will [be] provide[d] equally to other religious (and nonreligious) groups." For this reason, as in Grumet, "we have no assurance that the next similarly situated group" will receive the same treatment. Id. And much like Grumet, "the historical context in this case" does not "furnish us with any reason to suppose" that those seeking to distribute Bibles in the schools represent "merely one in a series" of groups seeking this access. Id. Rather, a reasonable observer would know that the history of the Upshur County schools conclusively demonstrates that the proponents of Bibles are the only private groups that have ever sought to place religious texts in the public schools, see supra § I.A., and the demographics of heavily Protestant Upshur County powerfully suggest that no other religious group will ever seek to follow their lead.
 
 
 131
 Finally, a reasonable, informed observer would be aware that the Bible distribution took place during a regular school day when state law mandates school attendance and where the susceptibility of children to the "subtle coercive pressure[s]" of government and their peers is "most pronounced." Lee, 505 U.S. at 592, 112 S.Ct. 2649; see also Edwards, 482 U.S. at 583-84, 107 S.Ct. 2573. The Seventh Circuit, in holding another Bible distribution unconstitutional, noted that "[t]he only reason the Gideons find schools a more amenable point of solicitation than, say, a church or local mall, is ease of distribution, since all children are compelled by law to attend school and the vast majority attend public schools." Berger v. Rensselaer Cent. Sch. Corp., 982 F.2d. 1160, 1167 (7th Cir.1993). Both Reverend McDaniels and the newspaper statement of his follower voiced precisely this sentiment. See supra at 291 ("Schools are the best place to distribute [Bibles] because that's where the kids are."). As Justice Kennedy recently explained for the Court, "[w]hat to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy." Lee, 505 U.S. at 592, 112 S.Ct. 2649. He noted, citing several scholarly sources, that "[r]esearch in psychology supports the common assumption that adolescents are often susceptible to pressure from their peers towards conformity, and that the influence is strongest in matters of social convention." Id. at 593-94, 112 S.Ct. 2649 (emphasis added).
 
 
 132
 Of course, many of the children whom the majority holds constitutionally subject to the Bible distribution are not even "adolescents." The majority reaches its extraordinary holding as to these young children by employing an analysis, the neutrality test, see ante at 279-85, that simply does not apply in this nonpublic forum. See supra at 295-97. When the majority does briefly acknowledge the proper endorsement test analysis, ante at 284-85, 287-88, it ignores the history and context of the Bible distribution--all of which would have been apparent to any reasonable observer--and concludes that all Upshur County students except those in grades 1 to 4 "are particularly capable of recognizing" the distinction "between a school's equal access policy and school sponsorship of religion." Ante at 287 & n. *. This conclusion wholly ignores the youth of the middle school and junior high school children subjected to the Bible distribution. Neither the Supreme Court nor Congress have ever suggested, let alone concluded, that children this young have the capacity to discern whether school authorities effectively sponsor religion. Indeed, the legislative history of the Equal Access Act at issue in Mergens indicates that Congress specifically choose to avoid its application to children of this age. The original legislative proposal applied to both "public elementary and secondary school[s]," S.Rep. No. 98-357, at 38 (1984), reprinted in 1984 U.S.C.C.A.N. 2348, 2384, but the law enacted by Congress applies only to secondary schools, see 20 U.S.C.A. § 4071(a) (West 1990).
 
 
 133
 Moreover, although Congress has "rejected the argument that high school students are likely to confuse an equal access policy with state sponsorship of religion," Mergens, 496 U.S. at 250, 110 S.Ct. 2356 (plurality opinion), Upshur County high school students did not confront a choice between an "equal access policy and school sponsorship of religion." Ante at 287. Let me be clear: no "equal access policy" existed in the Upshur County Schools. Rather, students observed an established and consistently followed policy that permitted no private sectarian religious speech in the public schools, a policy that allowed private speech only from four youth groups distributing informational pamphlets (hardly the "vigorous exchange" characterized by the majority, ante at 285), a policy that reserved discretion to the school administrators over the "appropriateness" and "harmfulness" of materials, and a policy from which the School Board deviated only after a well organized effort headed by a clergyman managed to defeat a school tax levy. Reasonable, informed observers confronted with these facts could only conclude that the School Board had endorsed religion. As in Allegheny County, "[n]o viewer could reasonably think that [the Bibles] occupy this location"--here a table inside a public school during mandatory school hours--"without the support and approval of the government." 492 U.S. at 599-600, 109 S.Ct. 3086.
 
 
 134
 The majority's reliance on the fact that the distribution takes place in the hallways as students move from one compulsory class period to another does not alter the balance. See ante at 287-88. The Supreme Court has rightly noted that "[l]aw reaches past formalism." Lee, 505 U.S. at 595, 112 S.Ct. 2649. The State of West Virginia compels students to attend school, not just individual classes.
 
 
 135
 Indeed, the distribution of Bibles in public schools during periods of mandatory attendance may well amount to coercion just as the short, nondenominational school graduation ceremony prayers in Lee did. Justices Kennedy and Scalia have noted the difficulty in drawing the "line between voluntary and coerced participation" in a secondary school. Mergens, 496 U.S. at 261-62, 110 S.Ct. 2356 (Kennedy, J., concurring, joined by Scalia, J.). And the younger the children involved, the more obscure the line becomes. Here, as in Lee, "the school district's supervision and control" of a "school setting" succeeded in "plac[ing] public pressure, as well as peer pressure, on attending students" to "signify adherence to the religious expression." 505 U.S. at 593-94, 112 S.Ct. 2649. In Lee, the Court held it not "consistent with the Establishment Clause [to] place primary and secondary school children in this position." Id. at 593, 112 S.Ct. 2649.
 
 
 136
 I appreciate the factual differences between this case and Lee that might lead some to conclude Lee presented a more obvious Establishment Clause violation. For instance, in Lee, the challenged religious expression was a short nondenominational prayer while here it is distribution of a religious text, and it could be argued that coercive pressures to participate in a religious service exceed those inducing a student to accept a free Bible. However, in view of the power of the Bible as a tool of religious indoctrination, this argument loses force. As Justice Brennan has noted, the "Holy Bible[is] more clearly sectarian" than "rather bland" nondenominational prayers. See Schempp, 374 U.S. at 267, 83 S.Ct. 1560 (Brennan, J., concurring). Devout and well meaning members of the school community surely might bring more pressure on a student to participate in a Bible distribution than in a nondenominational graduation prayer.
 
 
 137
 Furthermore, other factual differences clearly indicate that the Bible distribution constitutes the more obvious Establishment Clause violation. For example, Bibles were made available during an entire school day, much longer than the two minutes of nondenominational prayer at issue in Lee. 505 U.S. at 594, 112 S.Ct. 2649. (Similarly, the majority's intimation that limiting the Bible distribution to a single day somehow cures any constitutional concern, ante at 281, 282, 285, 287-88 ignores the fact that although the graduation prayers in Lee subjected the students to religious activity only once or twice over the entire course of their elementary and secondary school careers, the Supreme Court squarely invalidated them.) Moreover, while most of the high school graduation ceremonies in Lee were "conducted away from the school," 505 U.S. at 583, 112 S.Ct. 2649, the Bibles were distributed in the schools. And, whereas the parties in Lee stipulated that "attendance at graduation ceremonies [wa]s voluntary," id., no one disputes that public school attendance is mandatory. Thus, the Bible distribution manifests the very element--"legal coercion to attend school,"--that the dissent in Lee found critically absent. Id. at 643, 112 S.Ct. 2649 (Scalia, J., dissenting).
 
 
 138
 Before concluding, I must briefly address the majority's suggestions that the restrictions, principally a disclaimer, placed on the Bible distribution render it constitutional. Ante at 280-81, 281-82, 285-86, 287-88. In some situations a disclaimer can help to prevent a perception of government endorsement, but an observer must be able to read and understand a disclaimer if it is to have any effect. It remains unclear whether the young children here could read or understand the Board's disclaimer, even if read to them. Furthermore, no disclaimer can save government action from an Establishment Clause challenge when, as here, "other indicia of endorsement ... outweigh the mitigating effect of the disclaimer." Id. 515 U.S. at 793-94 n. 2, 115 S.Ct. at 2462 n. 2 (Souter, J., concurring). Just as the nearly unanimous Stone Court concluded that a disclaimer was "not sufficient to avoid conflict with the First Amendment," 449 U.S. at 41, 101 S.Ct. 192, the disclaimer in this case simply cannot eliminate the many indications of government endorsement.
 
 
 139
 Moreover, although I recognize the visceral appeal of holding that the Bible distribution amounts to nothing more than a de minimis constitutional violation, the Supreme Court has repeatedly rejected precisely this sort of "de minimis " contention. The Court has held that "[i]t is no defense" to assert that constitutional violations are "relatively minor encroachments on the First Amendment." Schempp, 374 U.S. at 225, 83 S.Ct. 1560; see also Lee, 505 U.S. at 594, 112 S.Ct. 2649; Engel, 370 U.S. at 436, 82 S.Ct. 1261. With unmatched eloquence, the Court has explained that "[t]he breach of neutrality that is today a trickling stream may all too soon become a raging torrent and, in the words of Madison, 'it is proper to take alarm at the first experiment on our liberties.' " Schempp, 374 U.S. at 225, 83 S.Ct. 1560 (quoting James Madison, Memorial and Remonstrance Against Religious Assessments ).
 
 III.
 
 140
 The ratifiers of the Bill of Rights knew too well the danger posed by state encroachment on religious liberty, and so forbade official actions that favor religion or a particular religious creed. Government can convey a message of endorsement as well with a blind eye as with a firm voice or a guiding hand. And, particularly where impressionable school children are involved, government can coerce participation in even nominally voluntary religious activity. Today's majority chooses to ignore the evident effect of the Board's conduct. Neither the Establishment Clause nor the jurisprudence interpreting it countenance that result. I must, therefore, dissent.
 
 
 
 *
 While we are not convinced that, even in the elementary school context, concerns of coercion or endorsement should be sufficient to constitutionally foreclose the County from implementing a neutral policy designed to accommodate free speech and free exercise interests--especially where, as here, the children's only exposure to the private religious speech is both passive and limited--we are convinced that a majority of the Supreme Court might well believe that these concerns should be and are sufficient in the elementary school context to invalidate such a policy. We can appreciate fully what might be the Court's thinking in this regard. In elementary schools, the concerns animating the coercion principle are at their strongest because of the impressionability of young elementary-age children. Moreover, because children of these ages may be unable to fully recognize and appreciate the difference between government and private speech--a difference that lies at the heart of the neutrality principle--the County's policy could more easily be (mis)perceived as endorsement rather than as neutrality. Thus, because our obligation as a court of appeals is to reason as we believe the Supreme Court would, we do hold that the School Board's policy is unconstitutional to the extent that it allows the display of Bibles and other religious material in the elementary schools of the County. Accordingly, to the extent that the district court judgment sustains this aspect of the Upshur County policy, the judgment is reversed